**TRIBBLE et al. v. J. W. GREER CO.**
**Civ. A. No. 8140.**

United States District Court
D. Massachusetts.

May 13, 1949.

---

[1] Except taxpayers.

Choate, Hall & Stewart, Marcien Jenckes, Charles F. Choate, Boston, Mass., for plaintiffs.

Walter Powers and Sherburne, Powers & Needham, and Bertram H. Loewenberg, Boston, Mass., for defendant.

WYZANSKI, District Judge.

## A. Introduction

This is a suit in which plaintiffs seek to have the Court declare that the warrants of the J. W. Greer Company which they hold are valid and binding obligations of the defendant corporation, enforceable against it according to their stated terms. The principal issues raised are first, whether the corporation had the power to issue the warrants; second, whether the corporation took the necessary corporate steps for the issuance of these warrants; third, whether the warrants are supported by adequate consideration; and fourth, whether the plaintiffs are, in view of the withdrawal of Tribble from the corporation, under an obligation to surrender either to the corporation or to the Greers individually the common stock of the corporation together with the warrants to subscribe to further stock upon a repayment to them of the $49,734.30 which they paid to the corporation in September 1946. This fourth question subdivides itself into these subordinate aspects: was there a definite agreement between the plaintiffs and either the corporation or the Greers as to the resale of these securities in the event of Tribble's withdrawal from the corporation; if there was a definite agreement, is it, inasmuch as it was oral, provable despite the inhibitions of the statute of frauds; and if the agreement existed, was it integrated in written contracts which, under the parole evidence rule, have become the effective and superseding agreement between the parties. A final point is whether, if the plaintiffs have a valid legal claim to the warrants but if they entered into an oral and unenforceable agreement to resell the securities, this Court should withhold the relief which the plaintiffs seek on the ground that they seek to have this tribunal aid them in executing a plan which has given them an unconscionable advantage over the Greer family.

## B. Findings of Fact

Fdg. 1. J. W. Greer and his wife, Dee S. Greer, some forty years ago opened a family business for the manufacture of machinery to make candy and other confectionery. They prospered. In 1925 they incorporated the business as J. W. Greer Company, a Massachusetts corporation. They took into it their two sons, Frederick and Don, the former of whom was an M. I. T. graduate, the latter of whom was a

graduate of both Harvard Engineering School and Harvard School of Business Administration.

Fdg. 2. Through the sons the parents met in the 1930's Paul B. Coffman, now a citizen of New York, then a professor at the Harvard School of Business Administration and more recently President of Standard Research Consultants, Incorporated and an executive of numerous well-known business corporations and of companies publishing investment statistical information. The Greers had great confidence in his friendliness, in his economic sagacity and in his integrity.

Fdg. 3. The elder Greers had reached the conclusion that it was time that they should withdraw from business. Moreover, they felt that the problems presented by the war and likely to be presented by the post-war required the managerial and financial services of persons of wider vision and greater experience than any of the Greers possessed.

Fdg. 4. Accordingly, in early 1945 Fred Greer got in touch with Coffman and told him that the parents wanted to sell out their interest and the family wanted to get in new blood but the outsider must be a sympathetic, trustworthy person. Coffman at once indicated that he would be too busy to come into the enterprise except as a director. However, at Coffman's suggestion the Greers met George E. Tribble of Maryland. Tribble had had wide financial experience. In the early 1930's he had been an executive of a Florida bank and had managed some of the financial affairs of Alfred I. duPont. Thereafter he had been a principal officer of the Maryland Casualty Company which had close relationships with and was an important debtor of the Reconstruction Finance Corporation.

Fdg. 5. When he was introduced to the Greers, Tribble made a very favorable impression upon them. They trusted and liked him. However, at first they were not quite clear that it was with him that they ought to make their arrangements. Against the possibility of inviting him to join them they were weighing the opportunities presented by the American Machine and Foundry Company which was interested in purchasing an interest in the J. W. Greer Company. Negotiations of a very general character proceeded back and forth, and it was finally decided by the Greers that they would attempt to work out an arrangement with Tribble.

Fdg. 6. In these preliminary negotiations there were discussions of many different aspects of the entry of Tribble into the enterprise and the withdrawal from it of the Greer parents. All parties recognized that the success of the new association would depend upon the continued mutual confidence of the Greer boys, the Greer parents and Tribble. The business had always been a closely-held family business. Indeed, as of June 19, 1946 the company had outstanding 3000 shares of common stock of which J. W. Greer owned 585 shares, Dee S. Greer 435 shares, Frederick W. Greer 990 shares and Don S. Greer 990 shares. The four Greers were directors, J. W. Greer was the president and Frederick W. Greer and Don S. Greer were active in the management of the company.

Fdg. 7. Against this background it was orally agreed that some of the stock which had belonged to the Greer parents should be sold to the corporation and should then be resold by the corporation to Tribble for about $50,000. It was also agreed that Tribble would secure warrants to purchase at a price to be determined in accordance with the book value of the securities on June 30, 1946 other stock which the company would acquire from the Greers. This date was selected because in June the company had accountants going over the books and it would be relatively easy to ascertain the book value of a share of stock as of June 30, 1946. The figure ultimately ascertained by this process was $21.53 per share. It was recognized that so long as Tribble did not exercise his warrants his ownership of the common stock would be about one-third of the total and the other two-thirds would be in the hands of the Greers. There would be no outsiders. But from the start it was hoped that at some later date within a year or so the corporate situation would be such that stock could be offered to the general public. However, the stock control would be retained by the Greers and by Tribble. Tribble, if he

exercised the warrants, would have a minority of the common stock. At that stage of the negotiations it was planned to have the warrants expire one year after issuance. Another aspect of the arrangement was that the Greer parents would resign as directors and officers, that Coffman would become a director at $4,000 a year and that Tribble would become a director and officer of the company and also a paid employee. The exact terms of the employment of Mr. Tribble were in fact not formulated until September 6, 1946. At that time the corporation entered into a contract for the period from July 1, 1946 to December 31, 1948 first at $20,000 and later at $30,000 a year.

Fdg. 8. There was an overriding oral understanding between the four Greers and Tribble that the stock which was sold to Tribble, the warrants which he acquired, the positions to which he was elected as director and officer and the employment contract constituted, as the parties phrased it, "one package." These individuals (who included all the stockholders and directors of the company) recognized that for the first few years their association would be running through a "trial period" and they recognized that if in any respect the association was unsatisfactory to any of them either Tribble could withdraw or the Greers could ask him to withdraw, and that in such event there would be a complete "divorce".

Fdg. 9. But while the parties spoke about the possibility of a divorce, they never squarely faced what their rights would be if a divorce occurred. No doubt there was on all sides the expectation that if there were a parting of the ways Tribble would surrender his offices, his directorship, his employment, his stock and his warrants. However, there was no fixed number of months as a trial period, no clear obligation upon the corporation to buy shares and above all no definite understanding as to the price to be paid for shares resold, especially if the company had meanwhile experienced great profits or great losses. If there were losses, the individuals did not assume that Tribble could get back his investment. Nor if there were profits, did they assume that Tribble forfeited them at the whim of the Greers. It is incredible that Tribble agreed that if he were fired after the enterprise became profitable he would get back nothing but the close to $50,000 he put into the enterprise plus his salary. Such precision as to the price is not even claimed by Don Greer. Moreover, an agreement for a complete wash-out of the transaction (except for salary) would be so obviously to the disadvantage of Tribble that it is unlikely that such an astute and nimble financier would have made it. After all, he knew that in the early part of 1946 the company was losing money at the rate of $30,000 a year and was not paying any dividends on its stock and that therefore the securities were valued at a low figure. What he and the others anticipated was that when Tribble entered the enterprise it would become profitable, the stock would rise in value and the business would be one with which it was desirable to be connected. It would be unreasonable to assume that Tribble would be willing to enter into a picture where at any time within two years all the gains in the enterprise could be pulled away from him without his realizing any appreciation on his investment and with only the compensation he derived from his employment contract. Furthermore, during this "trial period" while shareholders of the company were receiving no dividends, the Greer parents who had the almost $50,000 were, or at any rate might have been, receiving interest on their money.

Fdg. 10. Taken cumulatively, these aspects of the negotiations lead me to conclude that while there was a loose "gentleman's agreement" that if the Greers did not get along with Tribble they would part on some basis which fairly accorded them their just rights, there was no definiteness or certainty as to the basic terms under which a separation would be carried out if one became necessary. There was, as a matter of fact, no express agreement upon, and no facts from which a clear or certain agreement can be inferred or implied with respect to, the rights of the Greers and Tribble if they wanted to part.

Fdg. 11. With the negotiations in this state, Tribble suggested that the company should engage the services of Thomas G. Corcoran to carry out the steps necessary to perfect their agreement. Corcoran had

met Tribble when the former was at the Reconstruction Finance Corporation and the latter at the Maryland Casualty Company. Corcoran also had previously represented the company in connection with O.P.A. matters and governmental price contract renegotiation problems. Corcoran assigned the work to one of his associates, Quinn Shaughnessy, who also had previously been at the R.F.C. Shaughnessy drafted a number of proposed minutes for two directors' meetings and for a stockholders' meeting to be held on June 20, 1946.

Fdg. 12. These drafts varied in some respects the oral understanding described in fdg. 7. Under the modified arrangement the documents set forth in detail the steps by which the corporation would buy stock from the Greer parents and the corporation would sell stock to Tribble and to Coffman in response to their offers. The votes provided for the authorization, issuance and terms of warrants to purchase the common stock and also for the authorization and terms of preferred stock. Finally there were miscellaneous provisions such as the elections of Tribble and Coffman as directors in the place of the Greer parents and the election of Tribble as an officer.

Fdg. 13. All of these drafts were forwarded from Washington by Shaughnessy so that they reached Boston about June 18, 1946. These documents were turned over by Frederick Greer, who received them, to Philip P. Wadsworth, a member of the Massachusetts Bar who had for a long time been counsel for the company but who had during the war years served in the United States Navy and who had not therefore been fully apprized of the early part of these negotiations. Fred Greer explained the general background and among other things spoke to him about the understanding which the Greers and Tribble had that if either side decided to terminate the association during the period of two years, then Tribble would leave the enterprise. When Wadsworth examined the documents and, indeed, again on June 20 he emphasized to the Greers the fact that there were many points which seemed to him to have been inadequately covered or to have been omitted. There were questions about the redemption price of preferred stock and so forth. But the point which is now material is that Wadsworth emphasized the fact that no specific terms had been laid down for the relationship which would exist if the parties reached disagreement within the so-called trial period of two years. Wadsworth said that the Greers were taking a great deal on faith and that he did not know whether they were legally protected and there were many loopholes. The Greer sons said not to raise technicalities.

Fdg. 14. Fully aware of this situation the Greer sons met with Shaughnessy, Tribble and Coffman on June 20, 1946 and went through the papers. Wadsworth pointed out some difficulties, the papers were redrafted and the meeting adjourned after the redraft was presented, as it began to grow dark on the night of June 20.

Fdg. 15. Between June 20 and July 3 Wadsworth worked over some of the proposed records of the two directors' meetings and the stockholders' meeting of June 20 and sent the worked-over drafts to Shaughnessy. Some more time elapsed, and it was getting too late to file the amendments to the articles of organization incorporated in those minutes with the Massachusetts Commissioner of Corporations and Taxation within the thirty days required by statute.

Fdg. 16. Accordingly, the Greers went through the form of another stockholders' meeting on August 21, 1946. The records of the August 21 meeting are substantially like the revised records of June 20, 1946 with some exceptions: restrictions were imposed upon the transfer of warrants; the par value of the common stock was changed from $100 to $10; the authorized common stock was changed from 3,000 to 50,000 shares; and of the outstanding 30,-000 shares each of the four Greers had ten times as may shares as he had had of the old stock. Within thirty days of this August meeting the amendments were appropriately filed with the Massachusetts Commissioner.

Fdg. 17. Not entirely satisfied with the transactions as they had been worked out, Tribble continued discussions with the

Greers. It was agreed that 2,310 shares formerly belonging to J. W. and Dee S. Greer should be presently sold to the corporation and that Coffman should buy from the corporation 1,160 shares and Tribble should buy from the corporation 1,150 shares. It was also agreed that Coffman and Tribble should receive warrants to buy up to 7,890 additional common shares which the corporation would acquire from the Greer parents, up to 2,250 additional common shares which the corporation would acquire from Fred Greer and up to 2,250 additional common shares which the corporation would acquire from Don Greer. Some of these warrants ran for one year; others for two years. The agreements referred to in this paragraph were made by the four Greers, Coffman and Tribble. They were not formally submitted to or approved by the corporation. But drafts of two directors' meetings and one stockholders' meeting were prepared and were read and approved at a directors' meeting on September 6, 1946 at which the Greer sons, Coffman and Tribble were present. In these records the company was authorized to buy at $21.53 a share 2,250 shares each from the two sons (in accordance with their offers), to retain that stock as treasury stock and to sell Coffman 1160 shares and Tribble 1150 shares. At this meeting Coffman and Tribble submitted offers of purchase from the corporation— Coffman to pay $24,974.80 and to receive 1160 shares (which the corporation had acquired from the Greer parents) and warrants to subscribe prior to dates in 1947 and 1948 to 6,195 shares (which the corporation had the right to buy from the four Greers); and Tribble to pay $24,759.50 and to receive 1150 shares and 6,195 warrants. These records were then read to a stockholders' meeting held the same day, September 6, 1946. Then on the same day there was a second directors' meeting where the offers of Coffman and Tribble were accepted, and the shares and warrants were delivered to them by the Greer sons. These warrants bore the corporate seal.

Fdg. 18. These September dealings were amicable but once again Wadsworth pointed out that a great deal was being taken on faith, that there were no specific details worked out as to the rights of the parties if there was a separation after a "trial period" and there were other loopholes. While it does not appear that Wadsworth pointed this out, it seems that, if the trial period was still intended to be a two year trial period, it never became clear whether the two years began in June 1946 or in September 1946. Moreover, all the ambiguities noted in fdg. 10 continued without clarification.

Fdg. 19. The sales and earnings of the Greer Company increased. Tribble in December 1946 asked for greater authority. He wanted to be made Chairman of the Board with power to hire and fire. The Greer sons did not like the prospect. Accordingly, a conference occurred at which they, Tribble and Coffman were present. As a result Tribble secured the title and authority he sought.

Fdg. 20. At a stockholders' meeting on May 20, 1947, with all the stock being represented, it was voted to extend the Tribble and Coffman warrants two years beyond their original date so that some expired September 1, 1949, others a year later. Thereafter new forms of warrants with the new expiration dates were given by the Greer sons to Coffman and Tribble in exchange for their old warrants. These instruments bore the corporate seal.

Fdg. 21. At a stockholders' meeting July 18, 1947 all the stockholders voted to split the common stock ten for one, each new share having a par value of $1. They also voted that the shares procurable on exercise of warrants should be multiplied accordingly.

Fdg. 22. On October 31, 1947 there was a stockholders' meeting at which all the stock was represented. All the records of the earlier meetings of the stockholders and directors in 1946 and 1947 were read and approved.

Fdg. 23. The net earnings of the company rose to several hundreds of thousands of dollars annually. The Greers and Tribble began to disagree. In January 1948 the Greers failed to elect Tribble or Coffman as a director or officer. The four Greers again became directors. Then on March 8, 1948 the 1050 Park Avenue Cor-

poration offered to sell to the corporation the stock and warrants which Tribble and Coffman had held.

Fdg. 24. The 1050 Park Avenue Corporation is a personal holding company, organized under the laws of New York, all the shares of which are owned by Tribble. In March 1948 it held by way of assignment and pledge all of the Greer securities which had been delivered to Coffman and Tribble. As far back as June 1946 Tribble had foreseen that he would wish to assign these shares and warrants in hope of achieving a tax advantage for himself, and he had urged that the warrants which he was going to receive should, both for these tax reasons and for convenience in the event that he should die prematurely, be made in an assignable form. Originally the Greers had expressed opposition to this because they wanted to be sure that no outsiders got into the company but they yielded to the tax and estate considerations to which Tribble adverted. It may also be appropriate to state at this point that in their talks between themselves, Tribble and Coffman had discussed how Tribble "should cut" Coffman into the deal. They had come to the conclusion that they should share the profits fifty-fifty. However, Coffman was not to put up any money except for the ten shares' advantage he had over Tribble. For these Coffman paid $215.30. The rest of the securities in which he was interested were financed on margin by Tribble's holding company. The matters just set forth explain how the 1050 Park Avenue Corporation received by way of assignment and pledge from Tribble and from Coffman their blocks of stock and of warrants.

Fdg. 25. Prior to May 26, 1948 the 1050 Park Avenue Corporation re-assigned the warrants to the plaintiffs. Tribble offered to sell the corporation 23,000 shares for $138,000 and warrants for 61,950 shares for $30,975; Coffman offered his warrants at the same price and offered 100 shares for $600. June 17, 1948 the corporation declined the offer.

Fdg. 26. Faced with the tender of the common stock and of the warrants the Greer parents and sons, who were by then the sole directors of the corporation, took the position that the warrants were given for nothing and did not have to be bought. Ultimately they also took the position, though this was not raised initially by them, that the warrants were not issued in accordance with Massachusetts law and moreover that, since they lacked consideration, they were not valid corporate obligations. So far as the common stock was concerned, the Greer Company or the Greers were undoubtedly prepared to make a repurchase. But from the corporate records and the testimony given at the conclusion of the direct examination of Don Greer it is transparent that those acting for the Greer Company did not promptly proceed upon the theory that the company and the Greers personally had a legal right to purchase (or upon a tender had a legal obligation to purchase) this common stock at precisely the figure of $49,734.30 at which it had been acquired by Tribble and Coffman. The view of those acting for the company was that the exact terms and price and manner of payment and other details were yet to be worked out and that no formula had been devised.

Fdg. 27. The tender of the plaintiffs having been rejected, they now bring this suit to have the warrants declared valid and binding corporate obligations. Their interest in having this declaration springs from these considerations—(a) there is a cloud on the warrants so long as the company contests their validity and so long as it claims that the Greers are entitled to have the warrants surrendered to them or to the company upon the payment by the Greers or the company of approximately $50,000 to the plaintiffs; (b) in connection with a current offering by the company of its preferred stock the company has indicated that the warrants are not binding on the corporation and confer no rights on plaintiffs; (c) if there is dispute as to the validity of the warrants, the situation between now and September when the plaintiffs must raise and pay the money if they are to exercise the warrants will be unduly complicated.

## C. Conclusions of Law

Stated compendiously, these are my conclusions:

Conc. 1. This Court has jurisdiction over the controversy. The plaintiffs and their assignor are citizens of or incorporated in a state of the United States other than the state in which the defendant is incorporated. Because of the prosperity of the company and the consequent value of the warrants, more than $3,000 exclusive of costs and interest is involved.

Conc. 2. This is an appropriate proceeding for a declaratory judgment. There are involved legal relationships susceptible of justiciable determination. There is a present and actual controversy between the parties as to these rights. Prompt determination of the relationship between the parties is in their interest and in the general interest. If it be material, no other form of legal or equitable proceedings seems to be adequate to raise and dispose now of the dispute between the parties.

■ Conc. 3. The first substantive question is whether under Massachusetts law the corporation is authorized to issue a warrant giving the holder the right to subscribe for common stock which has already been authorized and issued and is either in the treasury of the corporation or in the hands of a person already under obligation to sell to the corporation. A warrant to subscribe to stock is nothing but a contract by which the corporation gives an irrevocable option to the holder to purchase authorized corporate stock within a period of time at a price and upon terms specified in the contract. Cf. Berle, Convertible Bonds and Stock Purchase Warrants, 36 Yale L.J. 649. Such an option contract may be entered into without any express provision in the statutes of Massachusetts, the articles of organization of the corporation or the by-laws of the corporation. Cf. Young v. Titcomb, 268 Mass. 14, 167 N.E. 286. Like other contracts it, of course, requires the assent of the appropriate corporate organ. But it is unnecessary in this case to decide what is the appropriate organ, or whether for the issuance of warrants the action of shareholders as well as the action of directors is required and what proportion of the shareholders must assent if the assent of any is required or whether pre-emptive rights might exist. For in this case it is conceded that every shareholder and every director knew about and assented to the issuance of the warrants. The fact that the assent was informal is of no significance in view of this unanimity. Murray v. Nelson Lumber Co., 143 Mass. 250, 251, 9 N.E. 634; Hurley v. Ornsteen, 311 Mass. 477, 480, 42 N.E.2d 273.

■ Conc. 4. The second substantive question is whether the warrants were issued without consideration and hence are unenforceable obligations. There was actual consideration for the warrants originally issued in 1946 inasmuch as the cash payments made by Tribble and Coffman were in exchange for the warrants and the shares. Also there was actual consideration for the warrants issued in 1947 inasmuch as the 1946 warrants were given in exchange for the 1947 warrants. Moreover, the warrants bore the corporate seal which the Greer sons, who were respectively president and treasurer, affixed pursuant to implied authority conferred both by all the directors and all the stockholders. And that seal so affixed imports consideration. Kaplan v. Suher, 254 Mass. 180, 181, 182, 150 N.E. 9, 42 A.L.R. 1142.

■ Conc. 5. While there was a loose "gentlemen's agreement" on the part of Tribble and Coffman with not only the Greer sons but with the corporation to resell their stocks and warrants if within an unspecified period of time Tribble withdrew from the firm or was asked to withdraw, there was no legal agreement because there was no certainty or definiteness as to the price or the formula for fixing the price or for other essential terms under which a resale would occur. Young v. Titcomb, supra; Geo. W. Wilcox, Inc. v. Shell Eastern Petroleum Products, Inc., 283 Mass. 383, 388, 186 N.E. 562; Michael Chevrolet, Inc. v. Institution for Savings, 321 Mass. 215, 72 N.E.2d 514; Restatement, Contracts, § 32.

Conc. 6. Though warned by their counsel of the legal weakness of their position, the Greers chose to rely upon a friendly understanding. They may have misplaced their reliance as to who were friends, but

there has been no fraud or deception as to the strictly legal consequences of the arrangements made in June and September 1946 and thereafter.

Conc. 7. In view of the conclusion that there was no definite agreement between the Greers and the plaintiffs or between the corporation and individuals as to the terms and conditions under which securities acquired in 1946 and 1947 should be resold in the event of a disagreement between the parties, it becomes unnecessary to rule on either the statute of frauds or parole evidence points.

█ Conc. 8. Insofar as the Court is pressed to refuse this declaration of rights on the ground that plaintiffs' conduct has been unconscionable and that they are asking an unreasonable price, the argument must be rejected as proceeding from a false premise. I have no power or discretion to withhold a declaration of legal rights merely because the plaintiffs are seeking to drive a hard bargain. The Greer family consisted of four mature business persons. When they sold their securities, they knew all the facts. They were experienced in estimating business questions. They had not only the advice but the warning of a lawyer of their own choice. Confident of their competence as judges of men's character, they took a calculated risk based on their estimate of Coffman and Tribble. And they lost.