JAMES R. THOMAS *vs.* WILLIAM E. CHRISTENSEN & others.[1]

Worcester. February 19, 1981. — July 1, 1981.

Present: ARMSTRONG, ROSE, & DREBEN, JJ.

*Practice, Civil,* Summary judgment. *Contract,* Construction of contract, Performance and breach, Sale of stock. *Evidence,* Extrinsic affecting writing.

In an action for breach of a written agreement under which the defendant was allegedly obligated to sell his shares of stock in a corporation to the plaintiff at book value, the judge erred in concluding that the purchase agreement was so closely related to a simultaneously executed employment contract that the termination of the plaintiff's employment terminated his right to purchase the stock, where the two contracts together constituted an integrated agreement setting forth the entire understanding reached by the parties, and there was nothing in either agreement that limited the plaintiff's right to purchase stock to the period of his employment.  [174-177]

In an action for breach of a written agreement under which the defendant was allegedly obligated to sell his shares of stock in a corporation to the plaintiff at book value, the defendant was not entitled to summary judgment on the ground that the plaintiff was unable to pay the purchase price of the stock at the time of the breach where the pleadings and affidavits raised factual issues as to whether the plaintiff was at that time under an obligation to be ready, willing and able to purchase the shares and whether the plaintiff then had the ability to produce the necessary funds.  [177-178]

CIVIL ACTION commenced in the Superior Court Department on December 28, 1978.

The case was heard by *Mulkern,* J., on a motion for summary judgment.

[1] Barbara E. Christensen, Sancliff, Inc., and Chubb, Inc.  The complaint sought, inter alia, orders restraining the corporate defendants from transferring any shares of stock standing in the name of William E. Christensen or from transferring assets other than in the usual course of business.

*Douglas A. Meystre (William D. Jalkut* with him) for the plaintiff.

*Joseph G. Sandulli* for the defendants.

DREBEN, J.  The plaintiff (Thomas) seeks damages for the breach by the defendant William E. Christensen (Christensen) of a written purchase agreement under which Christensen was, it is alleged, obligated to sell his shares of Sancliff, Inc. (Sancliff) to Thomas at book value.[2]  On cross motions for summary judgment, supported by affidavits, depositions and other documents, a judge of the Superior Court granted the defendants' motion.  The judge concluded that Thomas's rights to purchase the stock were "so closely interwoven" with an employment contract between Sancliff and Thomas that the termination of Thomas's employment effectively terminated his rights to purchase the stock.  The plaintiff appealed from the ensuing judgment entered for the defendants, and the defendants cross appealed, claiming that the judge should have set forth, as an additional basis for the judgment, Thomas's financial inability to purchase the stock at the time of the alleged breach.[3]

The following facts taken from the materials filed by the parties in support of their cross motions appear undisputed.  In May, 1975, Thomas, the owner of Millbury Die Company (Millbury), a small die making company, was introduced to Christensen, the sole stockholder of Sancliff, a larger die making company.  Christensen was considering retirement in a few years and was looking for a younger man to take over his business.  After preliminary negotiations between Christensen and Thomas and the former's lawyers, the law firm representing Christensen and Sancliff

---

[2] Other claims alleging freeze-out by the defendant Barbara E. Christensen (wife of William and a director of Sancliff) and interference with Thomas's contractual relations by the defendant Sancliff, Inc., were waived by the plaintiff's counsel at oral argument before this panel.

[3] The cross appeal was unnecessary as a party prevailing in the Superior Court "may present on appeal any ground which was previously asserted below in support of the judgment." *Boston Edison Co.* v. *Boston Redevelopment Authy.*, 374 Mass. 37, 43 (1977).

prepared two agreements which were signed by the parties on June 9, 1975.[4]

One, which we refer to as the purchase agreement, was between Sancliff, Millbury, Christensen and Thomas, and provided for the purchase by Sancliff of the assets of Millbury in exchange for Sancliff stock. It also provided that Millbury and Thomas were to use their best efforts to retain for Sancliff the customer accounts of Millbury listed on an attached schedule and that Sancliff and Thomas were to enter into an employment contract in the form appended to the agreement. The employment contract was, by the terms of the purchase agreement, made "subject to the express condition subsequent of successful consummation of the closing." The purchase agreement also gave Thomas the right to purchase from Christensen as many shares of Sancliff as he wished, provided that during the first three years after the closing Thomas could not purchase more than one third of the total outstanding shares. Thereafter, he could, subject to a condition not here relevant, purchase any number of shares. The price of the stock was to be equal to the book value of the shares "as at the end of Sancliff's last fiscal year." Thomas's right to purchase was to terminate upon the expiration of three years from the date of Christensen's death or of the inception of Christensen's total and permanent disability, whichever first occurred. The provision (paragraph 4 of the purchase agreement) setting forth Thomas's right to purchase stock is set forth in full in the margin.[5] All stock of Sancliff was to be restricted and had to be offered first to the other stockholders.

---

[4] Thomas had no separate counsel of his own, although his deposition suggests that he believed that one of the lawyers hired by Christensen was looking out for his interests.

[5] "[Christensen] hereby agrees to sell to Thomas such part or all of the five hundred (500) shares of Sancliff's voting common stock without par value now owned by [Christensen] (and being all of Sancliff's outstanding stock) as Thomas may desire to purchase from time to time. [Christensen] agrees to sell said shares at a price equal to the book value of said shares as at the end of Sancliff's last fiscal year prior to each purchase by Thomas as determined by Sancliff's independent accountant employing generally

The second agreement executed on June 9, 1975, was the employment contract between Thomas and Sancliff referred to in the purchase agreement. It conditioned the employment agreement and Thomas's continued employment upon the "successful consummation of the closing of the matters referred to in said agreement of even date." Unless sooner terminated, the employment contract was to end on June 9, 1978, with automatic one-year extensions in the absence of written notice by either party of an intention to terminate. If the contract were terminated by the employer, Sancliff was to transfer to Thomas the machinery and equipment acquired from Millbury, and Thomas was to transfer to Sancliff "all of the shares of stock . . . which were the consideration for the acquisition of the machinery and equipment" as provided in the purchase agreement. The relevant provisions of the employment contract are set forth in the margin.[6]

accepted accounting principles applied on a consistent basis from year to year. Thomas shall not have the right for three (3) years from the date of the closing to purchase an aggregate of more than that number of said shares which, when added to all other such shares then owned by Thomas and Millbury, equals or exceeds one-third ($\frac{1}{3}$) of the total number of such shares outstanding. After said three (3) years Thomas may purchase from time to time any number of said shares as he may desire, provided, however, if the number of shares Thomas desires to purchase at any particular time would, when added to all other such shares then owned by him and by Millbury, equal or exceed two-thirds ($\frac{2}{3}$) of the total number of such shares outstanding, then [Christensen] shall have no obligation to sell any additional such shares to Thomas unless Thomas purchases all remaining shares then owned by [Christensen]. The foregoing purchase of rights of Thomas shall terminate upon the expiration of three (3) years from the date of [Christensen's] death or of the inception of [Christensen's] total and permanent disability, whichever first occurs."

[6] "If the Employer [Sancliff] terminates this agreement for any reason, the parties agree as follows:

"(i) The Employer shall thereupon transfer and deliver to the Employee all of the machinery and equipment owned by the Employer and listed on Schedule A of an agreement of even date between the Employer, the Employee, William E. Christensen and Millbury Die Company, Inc. (to the extent that the Employer has not sold or otherwise disposed of such machinery and equipment with the consent of the Employee), and the Employee shall transfer and deliver (or shall cause Millbury Die Company, Inc. to transfer and deliver) to the Employer all of the shares of

Thomas began work immediately, although the closing, because of difficulties in selling Millbury's real estate and the latter's inability to pay a debt to the Small Business Administration, did not take place until February 2, 1976. On that date eighteen shares of Sancliff stock were transferred to Thomas in exchange for the assets of Millbury.

At some time around May or June, 1978, Christensen spoke to Thomas and one Bellrose, another employee of Sancliff, concerning the possible purchase of Christensen's stock. Negotiations continued through January, 1979. However, by letter of February 1, 1979, Christensen, individually, and as president of Sancliff, notified Thomas that Sancliff had voted to terminate his employment contract, to continue his benefits and compensation until June 9, 1979, and to suspend him immediately from all participation in corporate affairs. The letter also stated that Christensen was prepared to complete the transfer of one third of the shares under the terms of paragraph 4 of the June 9, 1975, purchase agreement, and concluded as follows:

> "However, I further wish to advise you that in view of Sancliff's termination of your employment arrangement with the Corporation and in view of Sancliff's re-acquisition of the 18 shares of your no par value common stock of Sancliff, Inc. pursuant to said employment contract and consistent with our understandings

stock in the Employer which were the consideration for the acquisition of the machinery and equipment as provided in said agreement of even date.

"(ii) The Employee shall be bound by the covenant not to compete as provided in the foregoing subparagraph (b), provided, however, that said covenant shall not apply to the accounts listed on Schedule A hereof."

In connection with the covenant not to compete, paragraph 5 of the contract may be relevant. That provision reads:

"The Employee shall devote his entire time, attention and energies to the business of the Employer, and shall not during any term of this agreement be engaged in any other business activity whether or not such business activity is pursued for gain, profit, or other pecuniary advantage; but this shall not be construed as preventing the Employee from investing his personal assets in such form or manner as will not require any material services on the part of the Employee."

and agreements, from this day forward I consider any rights you may have had, if any, to purchase any of the shares of the no par value common stock of Sancliff, Inc. owned by the undersigned except as set forth herein to be null and void."

This action ensued.[7]

1. *Interpretation of the contract.* The trial judge found that it was "apparent from the contracts themselves, the depositions and affidavits furnished and the pleadings that the parties clearly contemplated that the end-all of the June, 1975, agreements was to provide for an owner-operated company, and that if at the end of the trial period they were satisfied that James R. Thomas should be that owner then he should have the opportunity to purchase the shares of the company remaining in the possession of Christensen." He concluded that the two agreements were so closely related that a termination of the employment contract terminated Thomas's right to purchase the stock. We disagree.

We accept the defendants' contention that the purchase agreement and the employment contract "were part of a single transaction." *Chelsea Indus., Inc.* v. *Florence*, 358 Mass. 50, 55 (1970). Moreover, the two contracts together seem reasonably complete and, in the absence of contrary evidence, are to be treated as an integrated agreement setting forth the entire understanding reached by the parties. *Robert Indus., Inc.* v. *Spence*, 362 Mass. 751, 754 (1973). The parties do not contend otherwise.

Where there are no disputed factual issues or inferences which affect the interpretation of an integrated agreement,

---

[7] The amended verified complaint filed on March 7, 1979, states that the original complaint, which was filed on December 28, 1978, was delivered to Christensen's attorney but, at the latter's suggestion, was not served because it was thought that service on Christensen would make settlement more difficult. The original complaint sought a declaration of rights and specific performance of Thomas's rights to purchase stock. The amended complaint sought damages for breach of contract and added counts which were later waived. See note 2, *supra.*

its interpretation is "a matter of law." *Robert Indus., Inc.* v. *Spence,* 362 Mass. at 755. Restatement (Second) of Contracts § 212(2) & Comment d (1981). In this case, we conclude that there are no such disputed factual issues or inferences, and we hold, for the reasons set forth below, that the plaintiff's rights to purchase Christensen's stock were not extinguished by his dismissal.

"The interpretation of an integrated agreement is directed to the meaning of the terms of the writing or writings in the light of the circumstances" of the transaction. Restatement (Second) of Contracts § 212(1) and Comment b (1981). *Robert Indus., Inc.* v. *Spence,* 362 Mass. at 755. No form of words is self-interpreting; meaning can only be understood in context. *Antonellis* v. *Northgate Constr. Corp.,* 362 Mass. 847, 851 (1973). However, "after the transaction has been shown in all its length and breadth, the words of an integrated agreement remain the most important evidence of intention." Restatement (Second) of Contracts § 212, Comment *b. Robert Indus., Inc.* v. *Spence,* 362 Mass. at 755. Looking at the words, we find no condition in either agreement limiting Thomas's right to purchase Christensen's stock to the period of his employment. The contracts simply do not deal with the termination of Thomas's right to purchase stock other than by reason of Christensen's death or disability.

The defendants rely heavily on what they call the "unraveling" provision in the employment contract to extinguish Thomas's rights of purchase. However, that provision only requires a return of the Sancliff stock acquired by Thomas in exchange for Millbury's machinery and equipment. See note 6, *supra.* Upon the signing of the purchase agreement, Thomas had the immediate right to purchase up to one third of the stock. Indeed, even in his February 1, 1979, letter of repudiation, Christensen acknowledged Thomas's continuing right to purchase those shares. The employment contract in no way provides for their return. Thus, the "return to Thomas of his equipment, his clients, and his right to compete" does not, as the defendants claim,

"confirm[ ] the unraveling of the relationship," nor does it follow that "[t]he termination of Thomas' employment must . . . extinguish any rights under the option to buy stock."

An affidavit filed by Christensen containing a statement set forth in the margin[8] as to his understanding, does not help the defendants' position. To the extent that the statement shows Christensen's own undisclosed and unmanifested intent, it is not relevant. See Restatement (Second) of Contracts § 212, Comment a (1981). Moreover, even if the affidavit can be taken as bearing on the *parties'* intent,[9] according any weight to such intent would put an "impossible strain" on the words used. Compare *Antonellis* v. *Northgate Constr. Corp.*, 362 Mass. at 851. Since the parol evidence rule bars giving effect to any agreement not contained in the integrated writings, Christensen's affidavit may not be used to show that an agreement was reached on an additional provision not contained in the documents. *Robert Indus., Inc.* v. *Spence*, 362 Mass. at 756. *Bendetson* v. *Coolidge*, 7 Mass. App. Ct. 798, 802-803 (1979). Restatement (Second) of Contracts § 213(2) (1981).

In a similar case, *Tribble* v. *J.W. Greer Co.*, 83 F.Supp. 1015, 1021-1022 (D. Mass. 1949), the court refused to read into the written agreement either a provision depriving an

---

[8] "It was my clear understanding that so long as I remained the controlling stockholder in Sancliff, Inc. these agreements provided for an initial and continuing trial period of the relationship between Thomas and your Affiant and that your Affiant at all times possessed certain rights to terminate Thomas' employment with Sancliff, Inc. and thereby sever his relationship totally with the company."

[9] Thomas's intent, as evidenced by his deposition, was not the same as Christensen's. His statement is somewhat equivocal and can be taken to mean that he thought he would have the right to purchase stock even if his employment were terminated. Another, and perhaps more likely meaning, is that he never considered the question. In any event, summary judgment would be inappropriate if interpretation of the contract were affected by the parties' variant understandings. See and compare *A. John Cohen Ins. Agency, Inc.* v. *Middlesex Ins. Co.*, 8 Mass. App. Ct. 178, 183 (1979) ("summary judgment on a matter dealing with motive, intent, or subjective feelings requires 'great circumspection'").

employee after the termination of his employment of the right to exercise his stock warrants or a provision requiring the employee to resell his stock to the corporation. See *Slater* v. *Easter*, 3 Mass. App. Ct. 757 (1975); *Leisure Sports Inv. Corp.* v. *Riverside Enterprises, Inc.*, 7 Mass. App. Ct. 489, 492-493 (1979) (option to purchase real estate could be exercised even after receipt of notice of termination of lease; compliance with lease not an implied condition). See also *Dittemore* v. *Dickey*, 249 Mass. 95, 104-105 (1924) (omission supplied only "if the instrument as a whole produces a conviction that a particular result was fixedly desired although not expressed by formal words"); *Stop & Shop, Inc.* v. *Ganem*, 347 Mass. 697, 701 (1964) (agreement will not be "extended by implication unless the implication is clear and undoubted"); *Lipton Professional Soccer, Inc.* v. *Bay State Harness Horse Racing & Breeding Assn.*, 8 Mass. App. Ct. 458, 462-463 (1979); 11 Williston, Contracts § 1295 (3d ed. 1968). See generally and compare Farnsworth, Disputes Over Omission in Contracts, 68 Colum. L.Rev. 860 (1968). Also compare *Fay, Spofford & Thorndike, Inc.* v. *Massachusetts Port Authy.*, 7 Mass. App. Ct. 336, 342 (1979).

We conclude that Thomas's right to purchase did not terminate by reason of his dismissal by Sancliff, and the granting of summary judgment on that ground was error.

2. *Inability to pay as a ground for summary judgment.* The defendants also attempt to sustain the granting of summary judgment on the ground that Thomas was unable to pay the purchase price of the stock. If the defendants are correct in their assertion that Thomas had not properly exercised his option prior to February, 1979, an issue which is not before us on these appeals, then Thomas at the time Christensen repudiated the agreement was under no obligation to be ready, willing and able to purchase the remaining shares as the time for Thomas's performance had not yet arrived. Compare *C. & W. Dyeing & Cleaning Co.* v. *De-Quattro*, 344 Mass. 739, 743 (1962).

Moreover, even assuming that the parties had reached the stage of their negotiations where Thomas was required to be

ready, able and willing to perform, he was not, after Christensen's repudiation, required to complete the process of obtaining financing. *Schilling* v. *Levin*, 328 Mass. 2, 5 (1951). *Leigh* v. *Rule*, 331 Mass. 664, 668 (1954). *Vander Realty Co.* v. *Gabriel*, 334 Mass. 267, 269, 270-271 (1956). *Tucker* v. *Connors*, 342 Mass. 376, 383 (1961). *LaVallee* v. *Cataldo*, 343 Mass. 332, 333-334 (1961). *Gossels* v. *Belluschi*, 4 Mass. App. Ct. 810, 811 (1976). All that Thomas would have to show is that he would have been able to purchase the shares if the contract had not been repudiated. We consider the affidavit of the officer of the Mechanics Bank to the effect that Thomas's loan application was under favorable consideration as of February 1, 1979, and the affidavits of Thomas's parents and in-laws sufficient to raise a material issue of fact as to Thomas's ability to produce the necessary funds. See *United States* v. *Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Lurensky* v. *Merchants Beef Co.*, 10 Mass. App. Ct. 832 (1980). Cf. *Gomes* v. *Fagerberg*, 10 Mass. App. Ct. 927, 928 (1980). Accordingly, summary judgment for the defendants on the grounds urged would have been improper.

For the reasons stated in part 1 above, the judgment for the defendants is reversed, and the action is remanded to the Superior Court for proceedings not inconsistent with this opinion.

*So ordered.*