**BOSTON EDISON COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**City of Holyoke Gas and Electric Department, et al., Intervenors.**

No. 87–1935.

United States Court of Appeals, First Circuit.

Heard June 6, 1988.

Decided Sept. 6, 1988.

Carmen L. Gentile with whom James H. McGrew, Bruder, Gentile & Marcoux, Washington, D.C. and Wayne R. Frigard, Boston, Mass., were on brief, for petitioner.

Joseph S. Davies with whom Catherine C. Cook, Gen. Counsel, and Jerome M. Feit, Sol., Washington, D.C., were on brief, for respondent.

P. Daniel Bruner with whom Frances E. Francis and Spiegel & McDiarmid, Washington, D.C., were on brief, for intervenors.

Before COFFIN and SELYA, Circuit Judges, and ACOSTA,[*] District Judge.

SELYA, Circuit Judge.

Boston Edison Company ("BECO") petitions for review of certain orders of the Federal Energy Regulatory Commission ("FERC" or the "Commission") refunding plant addition interest costs ("PAI") to some thirteen municipal agencies (the "intervenors"). We recount the history of the proceeding and then address the principal questions presented.

## I. BACKGROUND

Between 1974 and 1975, BECO entered into long-term energy contracts with the municipal agencies for the sale of fixed percentages of the electricity produced at "Pilgrim I," a nuclear power plant in Plymouth, Massachusetts. The contracts were filed with FERC pursuant to the Federal Power Act ("Act"), 16 U.S.C. §§ 824 et seq. (1982). Each contract ran between BECO and a single municipal agency. They were, however, similar in style and content. Each comprised a "basic agreement" and four appendices. The basic agreement was a standard form which varied only as to dates, customers' identities, ratable amounts of energy to be purchased, entitlement percentages, and the like. The appendices were uniform.[1] Because the several unit power contracts are, for our pur-

---

[*] Of the District of Puerto Rico, sitting by designation.

[1] The contract appendices covered the following topics: Appendix "A"—entitlement; Appendix "B"—delivery, transmission, and metering; Appendix "C"—payment; Appendix "D"—general terms and conditions. Because the proceeding before us centers around Appendix "C," we annex it in full to this opinion. We refer to it by the letter designation "AppC," followed by the page number within the document. For example, an item appearing on page 2 of Appendix C is cited as "AppC at 2."

poses, functionally identical, we treat the arrangement as if only a single contract ("Contract") existed between petitioner and the thirteen intervenors.

As we have mentioned, *see supra* note 1, Appendix "C" of the Contract governed the purchasers' payment obligations. It contained a financing formula for use in calculating billing rates. In 1980, BECO for the first time began invoicing the intervenors for PAI. On February 3, 1987, the intervenors filed a joint complaint with FERC, asserting that the PAI surcharges were impermissible and subjected them to a higher incremental debt cost than permitted by the financing formula. FERC granted summary judgment in the intervenors' favor, and issued an order requiring BECO to refund all PAI charges collected since 1980, with interest thereon, notwithstanding a claims limitation provision in the Contract. *City of Holyoke Gas and Electric Dep't v. Boston Edison Co.,* No. EL87-13-000, 40 F.E.R.C. ¶ 61,007 (July 2, 1987). Thereafter, FERC denied BECO's request for rehearing. *City of Holyoke Gas and Electric Dep't v. Boston Edison Co.* Nos. EL87-13-001, 002, 40 F.E.R.C. ¶ 61,303 (September 17, 1987). We have jurisdiction of BECO's ensuing review petition under 16 U.S.C. § 825*l*(b) (1982).

## II. PROPRIETY OF PLANT ADDITION INTEREST CHARGES

Petitioner contends that FERC erred in granting summary judgment in favor of the municipal agencies and in rejecting the proffer of extrinsic evidence. We are not convinced.

### A. *Standard of Review.*

Generally speaking, we have accorded deference to agency expertise in contract interpretation cases where the agency's interpretation "has a reasonable basis in the contract terms, the [relevant] Act's policies and the Board's expertise...." *NLRB v. C.K. Smith & Co.,* 569 F.2d 162, 167 (1st Cir.1977), *cert. denied,* 436 U.S. 957, 98 S.Ct. 3070, 57 L.Ed.2d 1122 (1978). Nevertheless, the traditional rule has been that agency decisions based on pure questions of law may be reviewed de novo. *See Texas Gas Transmission Corp. v. Shell Oil Co.,* 363 U.S. 263, 268–70, 80 S.Ct. 1122, 1125–27, 4 L.Ed.2d 1208 (1960) (meaning of contract subject to de novo review where Commission "professed to dispose of the case solely upon its view of the result called for by the application of canons of contract construction employed by the courts, and did not in any wise rely on matters within its special competence"). Some circuits read *Texas Gas* expansively. *See, e.g., Mid Louisiana Gas Co. v. FERC,* 780 F.2d 1238, 1243 (5th Cir.1986) (when agency's reading "relies solely on the language of the ... agreement itself, rather than on any technical or factual expertise," no deference accorded). Others take a more isthmian view. *See, e.g., Columbia Gas Transmission Corp. v. FPC,* 530 F.2d 1056, 1059 (D.C.Cir.1976) ("there is room, in review of administrative agencies, for some deference to their views even on matters of law like the meaning of contracts ... where the understanding of the documents involved is enhanced by technical knowledge of industry conditions and practices"); *see also National Fuel Gas Supply Corp. v. FERC,* 811 F.2d 1563, 1570 (D.C.Cir.) (suggesting that, as a matter of routine, reviewing courts should defer to plausible agency interpretations of contracts within regulated industry), *cert. denied,* — U.S. —, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987). This circuit has yet to carve its niche along this continuum.

In the present case, BECO suggests that we are bound to follow *Texas Gas* literally, while FERC urges that we ought not do so. FERC's exhortation strikes a responsive chord, as there is obvious merit in the proposition that agencies always—or almost always—exercise some measure of expertise when interpreting contracts germane to their administrative fields. Then, too, the Supreme Court's recent repudiation of the idea that courts need not exhibit any deference to an agency on "pure" questions of statutory law, *see Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984), may well adumbrate a similar result as to

"pure" questions of contract interpretation. Be that as it may, we leave definitive resolution of our place on the continuum for another day. Here, all roads lead to Rome. When we scrutinize these agreements in light of the relevant principles of contract law, without ceding special deference to the agency's interpretation, our reading of them vis-a-vis the PAI point comports exactly with FERC's. For that reason, we need not decide today how much, if any, deference should be accorded to an agency's resolution of a "pure" question of contract law under less certain circumstances.

### B. *Relevant Contract Provisions.*

 The Contract, which purports to "constitute the entire understanding" between the parties "superseding any and all previous understandings," Contract ¶ D–5.6, provides that each intervenor will pay a fixed percentage "of the sum of all of the costs incurred by [BECO] by virtue of: (1) the construction of, or any modifications or additions to the Unit ... and (2) the operation and maintenance of the Unit...." *Id.* at ¶ C–1.0, *reprinted in* AppC at 1. The contractual payment equation, *see id.* at ¶ C–2.0, *reprinted in* AppC at 1–2, includes both "capacity charges" and "monthly energy charges." The former are defined as comprising the sum of "demand charges" plus "investment expenses." *Id.* at ¶ C–6.1, *reprinted in* AppC at 6. The latter, which are subject to a mathematically precise formula, *see id.* at ¶ C–7.0, *reprinted in* AppC at 10, are not in issue in this proceeding.

The terms "demand charges" and "investment expenses" are themselves further defined. It is clear that petitioner cannot recover the PAI as an investment expense. This is so because, as Appendix "C" explains, the Contract caps total interest costs, and also specifically limits the construction interest expense which can be recaptured by BECO as an "investment expense." The cap is fashioned by "Factor BI," *see* AppC at 9, which restricts BECO's interest costs to the "weighted average of interest rates of all bond issues existing at the time of commercial operation of the Unit, revised as required to reflect refinancings of debt issues existing at the time of the commercial operation date." *Id.* The application of Factor BI leaves no doubt but that the financing formula is too inelastic to encompass petitioner's actual plant addition interest expense. The parties agree, for the purposes at hand, that "the interest cost of debt existing at the commercial operation date of the unit, as subsequently refinanced, is 8.06%." 40 F.E.R.C. at ¶ 61,013 n. 10. Conversely, "[a]djustment of the interest cost to reflect issuances during construction of the plant additions results in a debt cost of 12.852%." *Id.*

Undaunted by the Factor BI barricade, petitioner resorted to the catch-all clause in the compendium of includable demand charges, *see* Contract ¶ C–6.2.4, *reprinted in* AppC at 7, as a recoupment vehicle. Beginning in 1980, BECO billed the PAI costs which it incurred via the catch-all clause, reasoning that Factor BI applied only to the interest expense associated with the *original* construction of Pilgrim I and the refinancings of that indebtedness. BECO pointed to a general statement in the agreement to demonstrate that it was the parties' intent that the intervenors would pay "the sum of all of the costs incurred" by the utility. *See* Contract ¶ C–1.0, *reprinted in* AppC at 1. Because of this paramount principle, and because Factor BI limited recovery of PAI *qua* investment expense, BECO argued that equity—and the central theme of the arrangement—demanded that it be permitted to recover the full PAI cost in some other manner, as through the catch-all clause.

### C. *The Commission's Rationale.*

FERC ruled that petitioner had no right to bill the intervenors for PAI. It stated that the "debt portion of the cost of capital" was specifically defined, and thus circumscribed, by Factor BI—a definition which did not permit recoupment of actual interest costs associated with plant additions. 40 F.E.R.C. at ¶ 61,012. The Commission found that BECO's reading of the catch-all clause was overinclusive, holding that "the only reasonable purpose of the

... provision is to provide a mechanism to recover costs that were not specifically defined under the agreement." *Id.* Because debt cost was specifically defined in the financing formula, FERC opined that petitioner's rights of recapture were limited thereby. *Id.* On this point, the July order concluded with a finding "that BECO's calculation of interest expense [was] clearly inconsistent with the contractual provision." *Id.*

Petitioner moved for rehearing, and proffered inter alia the affidavit of a former officer, Benjamin Weiner, who had been privy to negotiation of the Contract in the 1972–74 time frame. By this means, BECO sought to introduce extrinsic evidence to illumine the parties' intent and the reach of the catch-all clause. FERC denied the motion, describing petitioner's approach as "inconsistent with the integrated, unambiguous contracts between BECO and the [municipal agencies]." 40 F.E.R.C. at ¶ 61,949. The Contract, FERC ruled, was "plain and clear on its face." *Id.* Accordingly, there was no need to resort to extrinsic evidence or to hold an evidentiary hearing.

### D. *The Merits.*

■ Petitioner alleges that the letter of the Contract unambiguously allows recovery of the PAI. Its first fallback position is that, if the language brooked any doubt, extrinsic evidence should have been received in order to illuminate the "plain meaning" of the Contract. Failing all else, petitioner avers that the Contract is at least ambiguous on this score—and, since a genuine issue of material fact existed as to intent, summary adjudication was improper. We see no need to treat separately with these initiatives or with BECO's related asseverations. Because the unadorned language of the Contract argues persuasively in respondent's favor, all three of petitioner's claims must be rejected.

By mutual consent, Massachusetts law governs state law questions of interpretation and performance. *See* Contract ¶ D–5.2. In Massachusetts, it is well settled that construction of an unambiguous contract is a question of law. *See, e.g.,* *Sparks v. Microwave Assoc., Inc.,* 359 Mass. 597, 270 N.E.2d 909, 911 (1971); *Thomas v. Christensen,* 12 Mass.App.Ct. 169, 422 N.E.2d 472, 476 (1981); *Edwin R. Sage Co. v. Foley,* 12 Mass.App.Ct. 20, 421 N.E.2d 460, 464–65 (1981). So long as the words of an agreement are plain and free from ambiguity, they must be construed in their ordinary and usual sense. In the search for plain meaning, a court should consider "every phrase and clause ... [in light of] all the other phraseology contained in the instrument, which must be considered as a workable and harmonious means for carrying out and effectuating the intent of the parties." *J.A. Sullivan Corp. v. Commonwealth,* 397 Mass. 789, 494 N.E.2d 374, 378 (1986). In short, " '[t]he interpretation of an integrated agreement is directed to the meaning of the terms of the writing or writings in the light of the circumstances' of the transaction." *Thomas,* 422 N.E.2d at 476 (quoting *Restatement (Second) of Contracts* § 212(1) and Comment b (1981)). It is only when the written agreement, as applied to the subject matter, is in some material respect uncertain or equivocal in meaning that "all the circumstances of the parties leading to its execution may be shown for the purpose of elucidating, but not of contradicting or changing its terms." *Robert Industries, Inc. v. Spence,* 362 Mass. 751, 291 N.E.2d 407, 409 (1973). *See also Cullinet Software, Inc. v. McCormack & Dodge Corp.,* 400 Mass. 775, 511 N.E.2d 1101, 1102 (1987); *Antonellis v. Northgate Constr. Corp.,* 362 Mass. 847, 291 N.E.2d 626, 628 (1973); *Keating v. Stadium Management Corp.,* 24 Mass.App.Ct. 246, 508 N.E.2d 121, 123–24 (1987).

In the first instance, it is for the court—or in this case, the agency—to determine if a written document is or is not ambiguous. *RCI Northeast Services Division v. Boston Edison Co.,* 822 F.2d 199, 202 (1st Cir.1987) (construing Massachusetts law). As common sense suggests and Massachusetts law requires, we read the papers as an integrated whole. As to charges and payments, the Contract does not purport to operate exclusively on a cost-driven basis. Appendix "C" is the touchstone. To be

sure, it functions in many respects as a cost-of-service tariff. Rather than specifying a rate, it elucidates a formula for calculating a rate. The formula uses cost variables, or categories of costs, to measure most components. *See, e.g.,* Contract ¶ C–6.2.1, *reprinted in* AppC at 6 (discussing operating and maintenance costs). As the utility's costs in each of these categories fluctuate, its charges vary proportionately, without the need for a rate change filing.

The Contract, however, does not comprise a full cost-of-service tariff; it has a fixed-rate component which, as FERC correctly concluded, is reflected in Paragraph C–6.3.2. In essence, this provision expressly delineates the several components of return on capital and establishes a stable rate of return on capital—a paradigm which contrasts notably with other aspects of the formula. For our purposes, the significance of this taxonomy is readily evident. The payment equation, *see* Contract ¶ C–2.0, *reprinted in* AppC at 1-2, is the master plan for figuring the municipal agencies' monthly bills. Factor BI, an integral part of the financing formula, defines the interest portion of the debt cost recoverable by the utility. *See id.* at ¶ C–6.3.2, *reprinted in* AppC at 8–9. Through explicit contractual definition, plant additions are considered as part of BECO's gross investment. *See id.* at ¶ C–4.1.2, *reprinted in* AppC at 4. The financing formula then requires gross investment to be narrowed to net investment, but the calculation, if performed in pursuance of the Contract's admonitions, *id.* at ¶¶ C–5.0—C–5.1.2, *reprinted in* AppC at 5–6, leaves plant additions fully included within the net investment rubric. "Total" financing expenses referable to net investment—and we think the use of the quoted word to be of some salience—are then to "be computed by application of the [financing] formula...." *Id.* at ¶ C–6.3.2, *reprinted in* AppC at 8. Yet that computation does not permit recovery of petitioner's actual PAI expense. The limitation built into Factor BI, restrict-

ing recovery of interest to interest on original plant construction and any refinancing thereof, convinces us, as it did the FERC, that BECO cannot recover plant addition interest costs under the Contract.

Petitioner's reliance on the catch-all clause for a contrary result is, we think, mislaid. That clause, Contract ¶ C–6.2.4, *reprinted in* AppC at 7, comprises a mechanism for calculation of "demand charges."[2] Structurally, the Contract leaves no reasonable doubt but that the catch-all clause is strictly limited to demand charges and does not extend to investment expenses. There is absolutely nothing to suggest that capital costs, like interest on new construction, whether or not residuous, can be included within the computation of demand charges; and the Contract's recital of provisions specifically geared to the recoupment of investment expenses, *see supra,* militates forcefully against such an open-ended reading of the payment equation. The structure of a contract, like the wording, sets out its meaning. *See, e.g., United States Fire Ins. Co. v. Producciones Padosa, Inc.,* 835 F.2d 950, 954–55 (1st Cir.1987). In this case, structure and language coincide. Both tell us, in no uncertain terms, that BECO had no license to charge PAI to the intervenors. In our view, Paragraph C–6.2.4 was not a proper conduit for such costs.

Nor does it profit petitioner to point to Contract ¶ C–1.0, *reprinted in* AppC at 1. Reading the Contract, as FERC did, to bar recapture of PAI in no way thwarts the parties' manifested wishes. Paragraph C–1.0 is merely a *general* statement of intention. It is true that the parties clearly meant that BECO recover all costs *as defined in the Contract.* There is nothing in the language of the introductory paragraph, however, which exhibits any collective desire to contravene the plain wording of the payment equation and the financing formula, or to treat PAI differently than other items of investment expense. As we parse the document, its structure and pre-

---

**2.** Under Contract ¶ C–6.2, demand charges are described as "the sum for the contract year of ... Operating and Maintenance Costs, plus ... Local Taxes, plus ... Insurance Costs, plus Paragraph C–6.2.4 Other Expenses."

cise phraseology must logically prevail over the more general statement of intention. *See Spartans Indus., Inc. v. John Pilling Shoe Co.*, 385 F.2d 495, 499 (1st Cir.1967) ("a construction which comports with the Agreement as a whole is to be preferred even if it be thought that certain language, viewed only by itself, more readily suggests something else"); *Erhard v. F.W. Woolworth Co.*, 374 Mass. 352, 372 N.E.2d 1277, 1279 (1978) ("[w]hen a provision with a well established meaning is contained in a contract, that clause, rather than any supposed intentions of the parties ·gleaned from analysis of other provisions, determines the[ir] obligations"); *cf. Dickson v. Riverside Iron Works, Inc.*, 6 Mass. App.Ct. 53, 372 N.E.2d 1302, 1304 (1978) (recognizing doctrine of ejusdem generis).

The argument that the Commission erred by not adverting specifically to Massachusetts caselaw is equally unavailing. In relying upon *Lucie v. Kleen–Leen, Inc.*, 499 F.2d 220, 221 (7th Cir.1974) (per curiam), the Commission seems to have applied an equivalent standard. *Lucie* stands for the proposition that extrinsic evidence is inadmissible, under the parol evidence rule, when it is introduced to "add to, detract from, or vary the terms of a written contract." *Id.* The Massachusetts courts hold the same. *See, e.g., Robert Industries*, 291 N.E.2d at 409; *Computer Systems v. Western Reserve Life Assur. Co.*, 19 Mass. App.Ct. 430, 475 N.E.2d 745, 749 n. 5 (1985); *Thomas*, 422 N.E.2d at 477; *Sage Co.*, 421 N.E.2d at 464–65.[3]

We sum up briefly. To permit the introduction of evidence dehors the Contract, there would have to be more than one "plausible definition" of the disputed language. *RCI Northeast*, 822 F.2d at 202; *Edmonds v. United States*, 642 F.2d 877, 881 (1st Cir.1981) (applying Massachusetts law). In the instant case, that threshold has not been crossed. FERC's reading of the document, we think, is a harmonious interpretation derived from within the four corners of the Contract itself. It comports with the parties' discernible intentions as mirrored by the text. It brooks no ambiguity when applied to the subject under discussion. In short, it is the only "plausible definition" of Appendix "C" as written.

In these well-lit circumstances, we believe that FERC acted correctly in granting summary relief. Though the parties, as an original proposition, could have provided for reimbursement of PAI expenses, they did not. The language they opted to employ was not susceptible to that end. Reviewing a Contract carefully crafted between sophisticated business entities, the Commission had no choice but to give effect to its plain· meaning. *See Paterson–Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 991 (1st Cir.1988) ("when the wording of a contract is unambiguous, the terms will be enforced"); *Edmonds*, 642 F.2d at 881 (similar); *Washington Metropolitan Area Transit Authority v. Mergentime Corp.*, 626 F.2d 959, 961 (D.C.Cir.1980) (court must, in the first instance, "determine[ ] the intention of the parties from the language used by the parties to express their agreement"). It follows inexorably, there-

---

**3.** BECO calumnizes FERC for a supposed misreading of *Lucie,* suggesting that the case holds that "the apparent clarity of a contract is never a·reason for excluding extrinsic evidence, which must be considered and analyzed as part of the threshold determination of contract ambiguity." Petitioner's Brief at 30–31. We. disagree. To the extent *Lucie* may have been susceptible to such an interpretation, it has been disavowed by the Seventh Circuit. *See Sunstream Jet Express, Inc. v. International Air Service Co.,* 734 F.2d 1258, 1266–68 (7th Cir.1984). The proper construction, under *Sunstream,* is that:

> In determining whether an ambiguity exists, as a matter of law, the [trier] may consider parol and extrinsic evidence. If the [trier]

determines that the contract in question contains no ambiguity, then no extrinsic or parol evidence is [to be considered by] the trier of fact.... Accordingly,....when interpreting a contract, parol and extrinsic evidence is only admissible at trial ... if the [trier] determines, as a matter of law, that the contract is ambiguous.

*Id.* at 1268 (citations omitted). In our view, *Sunstream* and *Robert Industries* are sisters under the skin and stand for essentially the same rule of law. The Supreme Judicial Court's position that a contract must be interpreted in light of its subject matter, *Robert Industries*, 291 N.E. 2d at 409, is, we think, tantamount to the Seventh Circuit's formulation.

**368**

fore, that FERC's rulings (1) finding that the plain and unambiguous language of the Contract foreclosed recovery of PAI, and (2) excluding extrinsic evidence on the point were, as a matter of law, unimpugnable.[4]

## III. SCOPE OF THE REMEDY

Once FERC determined that petitioner, since 1980, had improperly passed its PAI expense to the intervenors, it focused on the question of appropriate redress. The Contract contained a claims limitation provision, making charges incontestable if not challenged within one year. *See* Contract ¶ C–8.3, *reprinted in* AppC at 11. Mindful of this provision, the intervenors asked to have PAI charges from 1983 forward refunded,[5] apparently abjuring any entitlement to rebates for earlier periods. FERC, however, ordered the return of all PAI charges collected since 1980, with interest, reasoning that:

> While the parties may agree to bind themselves with a contractual statute of limitation provision ... they cannot contractually proscribe the Commission's ability to require refunds for any amounts improperly billed during the life of the agreement in contravention of the filed rate doctrine.

40 F.E.R.C. at ¶ 61,949. This declaration of suzerainty is interesting to a point—but the point is soon reached.

### A. *Regulatory Framework.*

■ We begin this leg of our odyssey with an overview of the ratemaking process. A regulated energy seller must file with FERC all rates and the "classifica-

tions, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services." 16 U.S.C. § 824d(c); *see also* 18 C.F.R. § 35.1(a). All filed rates must be "just and reasonable." 16 U.S.C. § 824d(a). Nevertheless, "the legality of rates so filed is not conditioned upon the Commission's approval. Unless they are challenged, either by an interested party or on the Commission's initiative, the filed rates become legal rates." *Montana–Dakota Utilities Co. v. Northwestern Public Service Co.,* 341 U.S. 246, 255–56, 71 S.Ct. 692, 697, 95 L.Ed. 912 (1951) (Frankfurter, J., dissenting). The filing requirement, in the first instance, is a notice requirement. *See Maine Public Service Co. v. FPC,* 579 F.2d 659, 663–64 (1st Cir.1978); *Borough of Lansdale v. FPC,* 494 F.2d 1104, 1110 & n. 33 (D.C.Cir.1974).

The filing requirement applies both to initial rates and to changes in rates. Whereas an initial rate is "set in the first instance by the public utility to cover new services rendered to new customers ... [a] changed rate, on the other hand, would apparently exist any time a newly filed rate schedule purports to modify or supersede a preexisting schedule." *Otter Tail Power Co. v. FERC,* 583 F.2d 399, 406 (8th Cir. 1978) (footnotes omitted), *cert. denied,* 440 U.S. 950, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979). Unlike the fixing of initial rates, changes in rates can—absent special circumstances not present here—be accomplished only upon advance notice to FERC and to the public. *See* 16 U.S.C. § 824d(d). This case involves an initial rate filing.

---

**4.** Petitioner's lament that FERC's interpretative ruling is so terse as to countervail the "reasoned decisionmaking" requirement, *see generally Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 851–52 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971), is altogether meritless. Though an agency's rationale cannot be occult or inscrutable, long-windedness for the sake of long-windedness is not to be encouraged. We have recently said that, so long as the "agency's path may reasonably be discerned" from its decision, we will not demand more as a matter of form. *Hernandez-Colon v. Secretary of Labor,* 835 F.2d 958, 961 n. 4 (1st Cir.1988) (quoting *Bowman Trans. Inc. v. Arkansas-Best Freight System,* 419 U.S. 281, 286,

95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)). In this instance, the agency's findings are sufficiently explicit and its thinking adequately explained. We have no difficulty in upholding the first disputed segment of FERC's orders on essentially "the grounds upon which the agency acted...." *SEC v. Chenery Corp.,* 318 U.S. 80, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943).

**5.** The 1983 bills became "final" within the Contract's purview on February 4, 1986. The municipal agencies' complaint was docketed on February 3, 1987. By then, according to the letter of Paragraph C–8.3, the bills for all years before 1983 had become incontestable.

As a rule, an initial rate filing takes effect automatically. Summary rejection of such a proffer is proper only if an illegality is patent. *Lansdale*, 494 F.2d at 1110; *see also* 18 C.F.R. § 35.5. Traditionally, summary rejection has been "used not to dispose of a matter on the merits but rather as a technique for calling on the filing party to put its papers in proper form and order." *Municipal Light Boards v. FPC*, 450 F.2d 1341, 1346 (D.C.Cir.1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972). Absent that eventuality, an initial rate, is "presumed just and reasonable until the Commission determines otherwise." *Otter Tail*, 583 F.2d at 405. But, as FERC's regulations make clear:

> The fact that the Commission permits a rate schedule or any part thereof ... to become effective shall not constitute approval by the Commission of such rate schedule or part thereof....

18 C.F.R. § 35.4.[6]

As to an initial rate, FERC may hold a hearing, either upon complaint or sua sponte, to determine the rate's lawfulness. If it finds the rate, or any charge therein, to be "unjust, unreasonable, unduly discriminatory, or preferential," FERC shall proceed to determine, the rate or charge, "to be *thereafter* observed and in force, and shall fix the same by order." 16 U.S.C. § 824e(a) (emphasis supplied). In the initial rate context at least, changes may usually be made only prospectively even if existing rates are determined to be unreasonable or unjust.[7] As far as start-up rates are concerned, it is settled that the Commission "lacks power to order 'reparations' in compensation even for unjust or unreasonable past rates." *Maine Public Service*, 579 F.2d at 667; *see also FPC*

*v. Hope Natural Gas Co.*, 320 U.S. 591, 618, 64 S.Ct. 281, 295, 88 L.Ed. 333 (1944); *City of Piqua v. FERC*, 610 F.2d 950, 954 (D.C.Cir.1979). As Justice Frankfurter explained, the Act did not give the Commission power to order make-whole refunds for past unreasonable charges because:

> Wholesale consumers of electric energy were apparently considered, as a rule, adequately protected by the provisions of the Act authorizing the Commission to grant prospective relief and, in certain circumstances, to order refunding of sums accumulated during the pendency of rate proceedings....

*Montana–Dakota*, 341 U.S. at 258 (Frankfurter J., dissenting).

### B. *The Filed Rate Doctrine.*

While FERC may not amend an initial filing retrospectively in the usual case, it can enforce the terms of a filed rate and order refunds for past violations of one. The filed rate doctrine, in essence, allows FERC,

> to insure that regulated companies charge only those rates of which [FERC] has been made cognizant.... [T]he Act bars a regulated seller ... from collecting a rate other than the one filed with the Commission and prevents the Commission itself from imposing a [retrospective] rate increase....

*Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577–78, 101 S.Ct. 2925, 2930–31, 69 L.Ed.2d 856 (1981).[8] While the Federal Power Act contains a "necessary and appropriate" provision, *see* 16 U.S.C. § 825h (granting FERC "power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate"), that provision merely aug-

---

**6.** Indeed, FERC's March 4, 1975 acknowledgement of the initial filings here at issue reaffirmed that "acceptance for filing does not constitute approval of any ... rate, charge ... or practice ...; nor ... as recogni[zing] ... any claimed contractual right or obligation...."

**7.** FERC has somewhat different tools available to it vis-a-vis changes in rates. *See* 16 U.S.C. § 824d(e); *see also Otter Tail*, 583 F.2d at 405–06.

**8.** Although *Hall* arose in the context of proceedings under the Natural Gas Act, the relevant provisions of the Natural Gas Act and the Federal Power Act are "in all material respects substantially identical." *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 353, 76 S.Ct. 368, 371, 100 L.Ed. 388 (1956).

ments whatever *existing* powers have been conferred on FERC by Congress, without itself comprising a source of *independent* authority to act. *See New England Power Co. v. FPC*, 467 F.2d 425, 430–31 (D.C.Cir. 1972), *aff'd*, 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974); *Murphy Oil Corp. v. FPC*, 431 F.2d 805, 810 (8th Cir.1970); *cf. Consolidated Gas Transmission Corp. v. FERC*, 771 F.2d 1536, 1551 (D.C.Cir.1985) (discussing analogous provision of Natural Gas Act, 15 U.S.C. § 717*o*). It is, therefore, far from an unbounded grant of remedial authority.

There are cases, to be sure, where the Commission's remedial power has been exercised to ensure refunds which were retroactive in nature. *See, e.g., Southern California Edison Co. v. FERC*, 805 F.2d 1068, 1070–72 (D.C.Cir.1986) (amounts charged through fuel adjustment clause in excess of the actual price of fuel ordered refunded); *Consolidated Gas Transmission Corp.*, 771 F.2d at 1550–51 (affirming refund order where utility, contrary to Commission regulations, failed to pass through adjustment credits); *East Tennessee Natural Gas Co. v. FERC*, 631 F.2d 794, 798–800 (D.C.Cir.1980) (refund appropriate to correct failure to pass along supplier credits as required under adjustment clause on file); *Delmarva Power & Light Co.*, 24 F.E.R.C. ¶ 61,199 at 61,461 (Aug. 1, 1983) (amounts improperly collected through fuel adjustment clause ordered refunded). Leaving aside that virtually all of these cases concerned fuel cost adjustments,[9] it is clear that none of them involved filed rates which were (i) initial rates, (ii) set by contractual agreement, (iii) which agreement included specific preclusions of, or limitations on, customers' assertions of claims. The effect of such a concatenation of circumstances upon the availability of remedial refunds remains, insofar as we can tell, an open question. To answer this question, we believe it helpful to consider a further principle enunciated by the Court.

**9.** We remarked once before that fuel cost adjustment clauses in energy contracts "are themselves unique animals that are not easily assimilated to classical rate-making principles."

## C. *The Mobile–Sierra Doctrine.*

The *Mobile–Sierra* doctrine impinges upon the cluttered corner where the prohibition against retroactive ratemaking butts up against the filed rate doctrine. Derived from the paired decisions in *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956) and in *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed.2d 388 (1956), the rule acknowledges that a salient purpose of the Federal Power Act was to preserve the "integrity of contracts, ... [thereby permitting] the stability of supply arrangements." *Mobile*, 350 U.S. at 344, 76 S.Ct. at 380. The Act recognizes the desirability of private contracts and the need of contracting parties to craft a variety of consensual terms and conditions. When negotiated in the context of initial rates, such agreements may then be filed and begin to operate, *de facto* and *de jure*, as the rate schedule. As the Court explained, the statute permits relations between utilities and wholesale customers "to be established initially by contract, the protection of the public interest being afforded by supervision of the individual contracts, which to that end must be filed with the Commission and made public." *Id.* at 339, 76 S.Ct. at 378. Because the rates, though set in the first instance by agreement, are subject to review and prospective modification by the Commission, the law "affords a reasonable accommodation between the conflicting interests of contract stability on the one hand and public regulation on the other." *Id.* at 344, 76 S.Ct. at 381. The obvious implication of the statutory scheme, as the *Mobile* Court suggested, is that,

> except as specifically limited by the Act, the rate-making powers of ... companies were to be no different from those they would possess in the absence of the Act: ... to fix by contract, and change only by mutual agreement, the rate agreed upon with a particular customer.

*Maine Public Service*, 579 F.2d at 668. The same cannot be said about plant addition interest costs—or about claims limitation clauses, for that matter.

*Id.* at 343, 76 S.Ct. at 380. *See also Sierra Power,* 350 U.S. at 352–55, 76 S.Ct. at 371–73. In the proverbial nutshell, the *Mobile–Sierra* doctrine is that:

> The contract between the parties governs the legality of the filing. Rate filings consistent with contractual obligations are valid; rate filings inconsistent with contractual obligations are invalid.

*Richmond Power and Light Co. v. FPC,* 481 F.2d 490, 493 (D.C.Cir.), *cert. denied,* 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 473 (1973).[10]

With this background, we turn to the remedial order, mindful that our proper prerogative is to review FERC's exercise of claimed authority to fashion anodynes under 16 U.S.C. § 825h for reasonableness. *See Southern California Edison Co.,* 805 F.2d at 1071–72; *Niagara Mohawk Power Corp. v. FPC,* 379 F.2d 153, 158–160 (D.C. Cir.1967).

### D. *Propriety of Remedial Order.*

Petitioner objects on several grounds to FERC's action in refusing to honor the claims limitation clause. It argues that the Commission impermissibly altered the contractual relationship between the parties, that the limitation was part of the filed rate and therefore insulated from retroactive change, that the clause was protected by the *Mobile–Sierra* doctrine, and that, in any event, the limitation should be enforced as a matter of state law. Predictably, FERC and the intervenors demur.[11] They contend that FERC possesses broad statutory authority to correct rate-related infractions and to order refunds of illegally-collected revenues. They prefer to characterize FERC's remedial order as an affirmation of the filed rate rather than as an evasion of it. They claim that *Mobile–Sierra* does not apply because petitioner's interpretation of it would adversely affect the public's stake in just and reasonable ratemaking. Lastly, they disparage the attempt to embroil state law in determining what remedial powers have been ceded by federal statutes to a federal agency.

Before plunging into this maelstrom of conflicting contentions, we note that the remedial order, technically, did not strike Paragraph C–8.3. Nevertheless, the burden of FERC's decision was effectively to override that clause. We, therefore, elevate substance over form, and tackle head-on the question of whether FERC's initial acceptance of the contract for filing placed Paragraph C–8.3 within the sheltered lee of the filed rate and *Mobile–Sierra* doctrines. Our reading of the Federal Power Act, the applicable regulations, and the caselaw leads us to conclude that it did. We elaborate.

First, despite the intervenors' imprecation to the contrary, it is plain that Paragraph C–8.3 is part and parcel of the rate schedule for purposes of the filed rate doctrine. *See* 18 C.F.R. § 35.2(b) (defining "rate schedule"); *see also* 16 U.S.C. § 824d(c) (rate schedules must be filed with "all contracts which in any manner affect or relate" to them). We believe that where, as here, a contract term provides that an overcharge—that is, a charge in excess of a "just and reasonable" rate—is actionable only within a specific period of time, that term clearly "affect[s] or relate[s]" to the rate, 16 U.S.C. § 824d(c); 18 C.F.R. § 35.2(b), so that the contract term is to be treated as an integral part of the rate schedule and the filed rate.

Once we accept the premise that the claims limitation clause is a part of the filed rate, FERC's reasoning is undone. The framework of the Act "simply defin[es] and implement[s] the powers of the Commission to review rates set initially by … companies." *Mobile,* 350 U.S. at 343, 76 S.Ct. at 380. The parties set such rates

---

**10.** *Mobile* and *Sierra* arose in the context of fixed-rate contracts. We agree with the District of Columbia Circuit, however, that the *Mobile–Sierra* doctrine is equally applicable "whether the parties agree to a specific rate or whether they agree to a rate changeable in a specific manner." *Richmond Power,* 481 F.2d at 497.

**11.** The intervenors' enthusiastic support of the order, notwithstanding their original request for refunds dating back only to 1983, is but one further proof that "irony is no stranger to the law." *Amanullah v. Nelson,* 811 F.2d 1, 18 (1st Cir.1987).

by filing rate schedules. *See* 16 U.S.C. § 824d(c); 18 C.F.R. § 35.1(a). Thereafter, the rate cannot be altered unless the utility requests a modification, 16 U.S.C. § 824d(d), or FERC sets a new rate after finding that the one on file is unjust or unreasonable. 16 U.S.C. § 824e(a). As a sister circuit aptly stated: "So long as the filed rate is not changed in the manner provided by the Act it is to be treated as though it were a statute, binding upon the seller and the purchaser alike." *Northwestern Public Serv. Co. v. Montana–Dakota Utilities Co.*, 181 F.2d 19, 22 (8th Cir.1950), *aff'd*, 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951).

Viewing Paragraph C–8.3 in this way dovetails nicely with the *Mobile–Sierra* doctrine as well. The claims limitation clause seems, by any reckoning, an integral part of the bargain struck by the contracting parties. More to the point, it represents precisely the sort of contractual commitment which is completely consistent with the filed rate and thus protected under *Mobile–Sierra*. The linchpin of *Mobile* is the idea that the law, by maintaining the integrity of contracts, "permits the stability of supply arrangements which all agree is essential to the health of the ... industry." 350 U.S. at 344, 76 S.Ct. at 380. A reasonable claims limitation clause—and no one asserts that Paragraph C–8.3 is unconscionable, overweening, or otherwise unreasonable—clearly enhances economic equilibrium by bringing certainty to the parties' dealings after the passage of an adequate period of time. Just as statutes of limitations and of repose help to keep the litigious world outside the ratemaking environment on an even keel, a balanced incontestability provision promotes stability within that environment. Both the utility

and its wholesale customer know where they stand. The former need not worry about refund liability after the limitation period has expired; the latter is on fair notice that it must examine submitted charges in an expeditious fashion or forever hold its peace. From the regulatory perspective, preserving the ability of the supplier to count its chickens once customer claims have been afforded a realistic chance to hatch seems to us to serve the public interest.

■ We remark, too, that such a rule brings a certain symmetry to the ratemaking process. *Sierra* held that, under the Act, a utility may agree to an unprofitable deal, and if it does, "it is [not] entitled to be relieved of its improvident bargain." 350 U.S. at 355, 76 S.Ct. at 372. *See also FPC v. Tennessee Gas Transmission Co.*, 371 U.S. 145, 153, 83 S.Ct. 211, 215–16, 9 L.Ed. 2d 199 (1962) (company must "shoulder the hazards" of setting its initial rate). The flip side of this proposition—that purchasers can make bargains which in hindsight prove improvident—seems logically inferable. It appears consistent with *Sierra*, therefore, to permit parties to insert a reasonable claims limitation clause into a rate contract, even though the utility may profit to an "undeserved" extent if the buyer fails seasonably to protest an overcharge. In our view, the policies enunciated by Congress are in no way demeaned by requiring primary energy distributors and their wholesale customers alike to exercise reasonable self-interested vigilance and to act promptly to protect their respective positions.[12]

FERC is, of course, empowered to order a contract term amended *prospectively* if that term is found to produce unjust or

---

12. We acknowledge that there may be instances where declining to turn back the clock might smack of unconscionability, or where some striking public necessity should be given overriding effect. *See Permian Basin Area Rate Cases*, 390 U.S. 747, 820–22, 88 S.Ct. 1344, 1387–89, 20 L.Ed.2d 312 (1968), (regulatory system premised on contractual agreements voluntarily devised, but agreements may be abrogated in circumstances of unequivocal public necessity); *Sierra*, 350 U.S. at 355, 76 S.Ct. at 372–73; *Public Service Comm'n v. FPC*, 543 F.2d 757, 797 (D.C.Cir.1974), *cert. denied*, 424 U.S. 910, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976). But we leave for another day the contours of any such exception. In this case, BECO actually incurred the plant addition interest costs, and the resultant increase in the intervenors' bills was manageable, so there was nothing unconscionable—or even inequitable—inherent in petitioner's recoupment of the dollars spent during the years 1980 through 1982. No "public necessity"—let alone an extraordinary one—underlay the Commission's burial of the claims limitation clause.

unreasonable results, *e.g., Piqua*, 610 F.2d at 954, or to use its rulemaking power to effect prospective changes. *E.g., East Tennessee Natural Gas Co.*, 631 F.2d at 798–800. FERC also "may apply its reasoned analysis of an issue to guide its disposition of individual cases ... [a]nd ... may articulate its general policy in a particular proceeding ... rather than in a rulemaking." *Kansas Gas & Electric Co. v. FERC*, 758 F.2d 713, 719 (D.C.Cir.1985) (citations omitted). *Accord Cities of Anaheim, Riverside, Etc. v. FERC*, 723 F.2d 656, 659 (9th Cir.1984). Yet it remains crystal clear that, in exercising such powers, "agencies may not impose undue hardship by suddenly changing direction, to the detriment of those who have relied on past policy." *Id.* Prior to the present proceeding, FERC had never hinted that reasonable claims limitations clauses would not be enforced—or even that they would be looked at askance. At the bottom line, therefore, petitioner was entitled to rely upon the enforceability of Paragraph C–8.3 as part of its filed rate contract. Although the Commission had the power to annul the operation of the claims limitation clause *in futuro*, it would be demonstrably unfair to subject BECO, after the fact, to a sudden, unforeseeable shift in the prevailing regulatory winds. The refund order for the 1980–82 period accomplished exactly that impermissible result.

It is not without significance that neither FERC nor the intervenors can point to any precedent squarely permitting the Commission retroactively to override a reasonable claims limitation clause. Their flagship case, *Kansas Gas and Electric Co.*, 27 F.E.R.C. ¶ 61,335 at 61,647 (June 1, 1984), *reh'g denied in relevant part*, 28 F.E.R.C. ¶ 61,112 at 61,195 (July 25, 1984) ("KGE"), steams well wide of the mark. There, the parties had agreed to be bound by the results of arbitration—but once the revised rate was determined (whether by arbitration or by negotiation), it had to be filed

with the Commission as a changed rate. It was, therefore, subject to plenary review as a voluntary rate-change filing. 28 F.E.R.C. at 61,195. Unlike the open-ended rate-change mechanism in *KGE*, the exact operation and net result of the claims limitation clause in this case were clear from the start. Moreover, in *KGE*, FERC had a duty "to independently determine that the new rate filing"—though the product of arbitration—complied with the Federal Power Act. *Id.* Thus, the arbitration award—which countervailed the statutory "just and reasonable" standard—lay directly athwart the Commission's duty. In the instant case, however, the only independent statutory duty left open to FERC—considering whether the initial rate, including Paragraph C–8.3, was unjust or unreasonable, and if so, altering it prospectively—in no way ran at cross purposes with enforcement of the claims limitation clause. Lastly, there was no element of detrimental reliance in *KGE;* the arbitral award had never been put into effect. That, of course, is at a far remove from this case, where all parties functioned for many years under Paragraph C–8.3, took its sanctity for granted, and assumed that the books were closed on their accounts after the incontestability period had elapsed.[13]

In our judgment, enforcement of the clause will not undermine FERC's power to enforce filed rates and deter overcharges. FERC remains free to declare contractual claims limitations unjust or unreasonable in the future. But that is a policy choice; there is, in the nature of things, nothing inherently unconscionable about such clauses. To the extent that they encourage customers to police filed rates, they assist the Commission. Concerns which are diligent in this task can be expected to challenge billings in a timely manner and secure full redress. Nor does it seem inequitable to hold less vigilant purchasers to forfeit. Finally, to the extent that clauses such as this offer some prospect of repose

---

**13.** We need not paint the lily by analyzing each of the other decisions on which FERC and/or the municipal agencies rely. *See, e.g., Mesa Operating Limited Partnership v. Louisiana Intrastate Gas Corp.*, 797 F.2d 238 (5th Cir.1986);

*Gulf Oil Corp. v. FPC*, 563 F.2d 588 (3d Cir. 1977), *cert. denied*, 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978). It suffices to say that the same sorts of distinctions which render *KGE* inapposite pertain to those cases as well.

to primary suppliers, they likely serve to lessen the need for speculative reserves and, in the end, to hold down costs. Certainly, they tend to promote economic stability.

In this instance, the next step follows easily. FERC's independent duty to enforce filed rates was, we think, enhanced, not contravened, by the claims limitation clause. The physiology of the clause—its purpose, operation, and effect as part of the rate schedule—was demonstrably clear upon filing. Inasmuch as FERC had already accepted the rate and the Contract for filing, the clause in no way involved a usurpation of the Commission's jurisdiction or an abridgement of its independent statutory responsibility. If, upon complaint or its own initiative, FERC were to determine the clause to be unreasonable or unjust—a determination it has yet to make—it might then exercise its independent statutory authority to alter the contract prospectively. But for the Commission to undo the clause after the fact, under the guise of enforcement, was to indulge in retroactive ratemaking of a rather rank variety. Because the claim that FERC was merely ordering the rebate of "illegally-collected" revenues ignores the incontrovertible fact that the claims limitation clause was part of the filed rate, it can be dismissed as little more than ingenious wordplay. The scope of regulatory authority does not turn on such quiddities.

Placed into proper perspective, then, treating the claims limitation clause as binding on FERC does not in any way undercut the purposes of the Act, as expressed in the *Mobile–Sierra* doctrine. To the contrary, such a ruling preserves the integrity of the Contract, strengthens the established ban against reparations in the initial rate milieu, and abets the public interest. Most importantly, it treats the Commission's remedial powers as finite, and gives proper weight to the solemnity of the parties' voluntary agreements, consistent with the limitative intent of Congress and the teachings of the Court.

## IV. CONCLUSION

We need go no further. For the reasons discussed herein, we rule that FERC was correct in disallowing petitioner's attempted pass-through of plant addition interest costs, but erred in disregarding the claims limitation clause. We therefore affirm the Commission's construction of Appendix "C" and its requirement that PAI costs collected for the years 1983 and beyond be refunded with interest, and we enforce the orders to that extent. Petitioner need not, however, refund plant addition interest charges collected for the years 1980, 1981, and 1982, and we decline enforcement of FERC's orders in that regard. All parties shall bear their own costs.

*The petition for review is granted in part and the directive that petitioner refund plant addition interest charges for the years 1980, 1981, and 1982 is reversed. The petition for review is denied in remaining part and the order of the Commission that PAI costs collected for the years 1983 forward be refunded, with interest, is affirmed and enforced. The cause is remanded to the Commission for further proceedings in accordance with the opinion of the Court of Appeals filed this day. No costs.*

## APPENDIX C

### Payment

#### C–1.0 *Intent*

It is the intent of the parties that Buyer shall reimburse Seller during the term of this Agreement as provided herein for 0.07463% of the sum of all of the costs incurred by Seller by virtue of: (1) the construction of, or any modifications or additions to the Unit and the Unit Related Transmission Facilities and allocable right-of-way identified in Paragraph B–2.0 and (2) the operation and maintenance of the Unit and the Unit Related Transmission Facilities included above.

#### C–2.0 *Total Amount Due*

Buyer agrees to pay Seller monthly, commencing with the date of this Agreement and continuing throughout the term of

this Agreement, ¹⁄₁₂th of the annual Capacity Charges as defined in Paragraph C–6.0 of this Appendix C

[AppC–1]

multiplied by 0.07463% plus the Monthly Energy Charge (MEC) as defined in Paragraph C–7.0 of this Appendix C.

Total Monthly Amount Due =

$$\left[ \frac{\text{Annual Capacity Chg.} \times 0.07463\%}{12} \right] + \text{MEC}$$

Such Capacity Charges shall be paid without regard to availability of the Unit or of transmission facilities. If the date of the Agreement occurs on a date other than the first day of a month, the Capacity Charge for the month shall be appropriately prorated. The monthly payment formula shall be expressed by the following equation:

**C–3.0 Basis of Total Amount Due**

Buyer and Seller agree that the Total Amount Due as defined in Paragraph C–2.0 of this Appendix C shall be based upon, and in accordance with, the definitions and the methods of calculation set forth in the following paragraphs of this Appendix C.

**C–4.0 Definition of Gross Investment for the Unit. Seller's Unit Related Transmission Facilities, and Allocable Right-of-Way**

[AppC–2]

C–4.1 Gross Investment for the Unit, Seller's Unit Related Transmission Facilities and Allocable Right-of-Way shall be:

C–4.1.1 The total of all Seller's original direct and indirect expenditures (including appropriate interest during construction to the Commercial Operation on December 9, 1972) made for or in connection with the Unit, (including but without limitation such allocable land and generating and switchyard facilities properly allocable to plant investment in accordance with the Uniform System of Accounts prescribed by the Federal Power Commission for Class A and Class B Public Utilities and Licensees), Unit Related Transmission Facilities and Allocable Right-of-Way identified in Paragraph B–2.0 at the beginning of any "contract year" (the twelve-month period beginning the first day of January following the date of this Agreement and each succeeding twelve-month period) for

which charges will be calculated. In the event that additional units are constructed at the site during the term hereof, the investment in commonly used facilities

[AppC–3]

including but not limited to the harbor breakwater, land and access road, shall be divided on a prorata basis between the units; plus

C–4.1.2 Additions and modifications to the Unit and Unit Related Transmission Facilities and allocable Right-of-Way (including appropriate interest during construction), which shall be included in Gross Investment commencing with the month in which said additions or modifications are placed in service; plus

C–4.1.3 An Allowance for prepaid items and cash working capital which are applicable to the Unit and Unit Related Transmission Facilities and allocable Right-of Way for a period of forty-five (45) days; plus

C–4.1.4 An allowance for materials and supplies (including nuclear fuel investment computed at the end of the prior contract year), needed to operate and maintain the Unit;

[AppC–4]

and Unit Related Transmission Facilities and allocable Right-of-Way; less

C–4.1.5 Extraordinary retirements to the extent not charged to the depreciation reserve, said retirements shall be re-

flected in the month the property is retired from service; plus or minus

C–4.1.6 All other investment cash flows relevant to the existence of the Unit and Unit Related Transmission Facilities and allocable Right-of-Way.

C–5.0 *Net Investment*

C–5.1 In order to arrive at the balance of the Net Investment, the following items shall be subtracted from the balance of the Gross Investment:

C–5.1.1 The balance of depreciation reserve at the end of the prior contract year where the annual depreciation charge is computed consistent with the method as described in Paragraph C–6.3.1 of this Appendix C; and

[AppC–5]

C–5.1.2 Cumulative cash generation at the end of the prior contract year arising from prior years' Federal and State tax deferral due to liberalized depreciation methods and the investment tax credit.

C–6.0 *Capacity Charges*

C–6.1 *Annual Capacity Charges* shall equal the sum of Paragraph C–6.2 Demand Charges, plus Paragraph C–6.3 Investment Expenses.

C–6.2 *Demand Charges* shall be the sum for the contract year of Paragraph C–6.2.1. Operating and Maintenance Costs, plus Paragraph C–6.2.2 Local Taxes, plus Paragraph C–6.2.3 Insurance Costs, plus Paragraph C–6.2.4 Other Expenses.

C–6.2.1 *Operating and Maintenance Costs* shall include all operating expenses (exclusive of fuel costs) and maintenance costs applicable to the Unit and the Unit Related Transmission Facilities and allocable Right-of-Way as identified in Paragraph B–2.0; less any applicable credits.

[AppC–6]

C–6.2.2 *Local Tax Expense* shall be property taxes, both personal and real, incurred by Seller for the Unit and the Seller's Unit Related Transmission Facilities and allocable Right-of-Way.

C–6.2.3 *Insurance Costs* shall be the costs incurred by Seller for insurance, including but not limited to Price–Anderson indemnity or similar indemnification for the Unit and the Seller's Unit Related Transmission Facilities and allocable Right-of-Way.

C–6.2.4 *Other Expenses* shall be allocated on an equitable basis for appropriate expenses which are common to the Unit and the entire system of Seller.

C–6.3 *Investment Expenses* shall be the sum of Paragraph C–6.3.1 Depreciation, plus Paragraph C–6.3.2 Total Financing and Income Tax Expenses.

C–6.3.1 *Depreciation* applicable to the facilities shall be computed on a straight line basis using Gross Investment and a service life of twenty-eight (28) years or until such time as the depreciation reserve equals the gross investment as defined below, at which time depreciation shall cease. For depreciation

[AppC–7]

purposes, Gross Investment as defined in C–4.0 shall be adjusted to exclude associated land costs, nuclear fuel investment, prepaid and working capital items, materials and supplies. Plant retirements, both normal and extraordinary, including salvage values and cost of removal, shall also be reflected through this subparagraph in a manner consistent with the method of handling on the Seller's books of account.

C–6.3.2 *Total Financing and Income Tax Expenses* shall be computed by application of the following formula for the Total Financing and Income Tax Rate as applied to the Net Investment as defined in Paragraph C–5.0,

but in no event shall the investment expense fall below zero.

Formula
Total Financing and Income Tax Rate Equals:
BR × BI
Plus PR × PD
Plus CR × CE
Plus $\dfrac{T}{1.0-T} \times ((PR \times PD) + (CR \times CE))$

[AppC–8]

*Where:*

BR = bond to total capitalization ratio, which shall be deemed to be equal to fifty-five percent (55%).

BI = weighted average of interest rates of all bond issues existing at the time of commercial operation of the Unit, revised as required to reflect refinancings of debt issues existing at the time of the commercial operation date.

PR = preferred to total capitalization ratio, which shall be deemed to be equal to ten percent (10%).

PD = weighted average of dividend rates of preferred stock existing at the time of commercial operation of the Unit, revised as required to reflect refinancings of preferred issues existing at the time of the commercial operation of the Unit.

CR = common to total capitalization ratio, which shall be deemed to be equal to thirty-five percent (35%).

[AppC–9]

CE = thirteen and one-half percent (13½%).

T = the current effective income tax rate applicable to the equity component of capital cost, in accordance with tax statutes applicable throughout the term of this Agreement.

## C–7.0 *Monthly Energy Charge*

Monthly Energy Charge (MEC) is the amount determined by the following formula:

MEC = Monthly Fuel × 0.07463%

where:

Monthly Fuel = the monthly fuel burnup expense applicable to the Unit including handling

## C–8.0 *Billing*

C–8.1 Bills for each month shall be rendered by the 10th day of the next succeeding month and shall be due when rendered.

C–8.2 If it becomes necessary to estimate costs, any item billed on an estimated basis shall be paid when rendered. An adjustment will be made to the extent appropriate after the actual cost of the estimated item has been determined.

[AppC–10]

C–8.3 Buyer shall not have the right to challenge any monthly bill, to invoke arbitration of the same or to bring any court or administrative action of any kind questioning the propriety of said bill after a period of one (1) year from the date the bill is rendered. In the case of a bill containing estimates, the Buyer shall not have the right to challenge the accuracy of said bill after a period of one (1) year from the date the bill is adjusted to reflect the actual amounts due.

## C–9.0 *Overdue Accounts*

If any account due remains unpaid for more than thirty days after rendering, Seller may charge Buyer's account with interest at the current prime interest rate of the First National Bank of Boston, or a similarly situated bank.

## C–10.0 *Sales or Gross Receipts Tax*

In the event Seller is required to pay a sales tax on or with respect to the sale of capacity and energy corresponding thereto to the Buyer hereunder, or gross receipts tax on receipts from the sale of

[AppC–11]

capacity and energy corresponding thereto to the Buyer hereunder, the amount of such tax will be reimbursed by Buyer to Seller.

[AppC–12]