CANAL ELECTRIC COMPANY,
et al., Plaintiffs, Appellees,

v.

WESTINGHOUSE ELECTRIC
COMPANY, Defendant,
Appellee,

Commonwealth Electric Company,
et al., Plaintiffs, Appellants.

CANAL ELECTRIC COMPANY,
et al., Plaintiffs, Appellees,

v.

WESTINGHOUSE ELECTRIC
COMPANY, Defendant,
Appellant.

CANAL ELECTRIC COMPANY,
et al., Plaintiffs, Appellants,

v.

WESTINGHOUSE ELECTRIC
COMPANY, Defendant,
Appellee.

Nos. 91–1432, 91–1433 and 91–1504.

United States Court of Appeals,

First Circuit.

Heard Jan. 7, 1992.

Decided Aug. 31, 1992.

Memorandum and Order on Denial
of Rehearing Oct. 16, 1992.

Sander A. Rikleen with whom Franklin C. Huntington, IV, Widett, Slater & Goldman, P.C., Mark F. Bruckmann, Wendy B. Millman and Mendes & Mount were on briefs, for Canal Elec. Co., Commonwealth Elec. Co., Cambridge Elec. Light Co. and Montaup Elec. Co.

Edward P. Leibensperger with whom Neil P. Motenko, Brian D. Ahern and Nutter, McClennen & Fish were on brief, for Westinghouse Elec. Corp.

Before BREYER, Chief Judge, CAMPBELL, Senior Circuit Judge, and CYR, Circuit Judge.

BREYER, Chief Judge.

The consolidated appeals in this diversity case arise out of the discovery, between 1983 and 1985, of tiny cracks (called "fretting") in the turbine blades of a Canal Electric Company generator. Canal Electric Company sued the firm that had promised to service the generator, Westinghouse Electric Corporation, claiming that Westinghouse had breached both the generator's service and equipment warranties. Several Canal customers (the third-party plaintiffs) also sued Westinghouse, claiming that the cracks harmed them, by disrupting Canal's operations, and thereby bringing about higher electricity prices.

The two law suits met different fates. The district court ordered a directed verdict against the third-party plaintiffs. Although it also dismissed some of Canal's claims, it permitted one of those claims—a claim for certain repair costs—to proceed to trial 756 F.Supp. 620. The jury awarded Canal $380,000 plus interest.

Westinghouse now appeals the judgment in Canal's favor. Canal has filed a cross-appeal. And, the third-party plaintiffs appeal the directed verdict against them. We reverse the judgment in Canal's favor, and we otherwise affirm the determinations of the district court.

I

*Background*

A

*The Basic Facts*

The basic facts in this case are not significantly disputed. They include the following:

1. In early 1983 Westinghouse promised Canal it would inspect and clean a generator, which Westinghouse had sold Canal fifteen years earlier.

2. The basic contract consisted of two purchase orders (dated February 24 and March 4, 1983), both of which cross-referenced (and thereby incorporated) a standard Westinghouse "selling policy" document. That document included an equipment and service warranty and various liability limitations.

3. In late February 1983 Canal found small cracks (the "fretting") in some of the generator's turbine blades. Westinghouse replaced the cracked blades in March 1983.

4. In July 1983, only a few months later, the blades broke; they "completely sheared off". Westinghouse replaced the new blades. The replacement job took four months. In November 1983 the generator was "ready for service" and went back on-line.

5. In April 1985, seventeen months later, Canal took the generator off-line for a routine inspection. During the inspection, Westinghouse found fretting in the same blades it had installed between July and November 1983.

6. Working together with Canal, Westinghouse eventually found ways to overcome the problem that was causing fretting in the turbine blades. But, the necessary studies and repairs were costly. The two companies disagreed about how to split the costs. Canal wanted Westinghouse to pay; Westinghouse thought they should split the costs.

## B

### Proceedings Below

We shall summarize, simplifying significantly, the lengthy proceedings of this case, while emphasizing matters relevant on this appeal. In their lawsuits, Canal and its customers basically claimed (1) that Westinghouse breached its equipment and service warranties through its failure to replace properly the blades that "sheared off" in July 1983, and (2) that Westinghouse breached its service warranty by failing properly to prevent the blade fretting that occurred between November 1983 and April 1985. The plaintiffs initially focused on the first of these failures, the one in July 1983, seeking to recover for losses suffered during the subsequent generator outage between July and November 1983.

The contract's "selling policy" contained two provisions that posed serious obstacles to the plaintiffs' July 1983 warranty claim. First, the warranty provision itself, while warranting the promised work for "one year" against "any defects in workmanship and material," also said simply that, "should any defect appear" during that time, Westinghouse "shall correct such nonconformity, by repairing or, at its option, replacing the defective work." Second, a "limitation of liability" provision said that Westinghouse "shall not be liable" for any "special, indirect, incidental or consequential damages whatsoever," that the "remedies ... set forth herein are exclusive," and that "the total liability of Westinghouse ... shall not exceed the price set forth for the work in the purchase order...."

These provisions threatened claims based on the July 1983 blade failure because Westinghouse had already refunded to Canal the purchase price of the blades that had then "sheared off." Westinghouse also had replaced the defective blades largely free of charge. It thus appeared to have satisfied its promise under the warranties to "repair or replace" defective parts, and seemed also to have reached the maximum liability ceiling set forth by the equipment warranty's limitation clause. Further, the damages the plaintiffs suffered during the July–November 1983 outage were basically "consequential" damages, such as lost profits and overtime expenses. The "limitation of liability" provision strictly barred recovery for such damages.

Faced with these obstacles, Canal and its customers argued that the "limitation of liability" provision was unenforceable. They claimed that Westinghouse, after the July 1983 blade failure, did not "repair[ ] or replace[ ] ... the defective work" on time. Rather, it delayed too long in making proper repairs. It thereby failed to live up to the exclusive remedy in the warranty. And, that failure (for various legal reasons), they said, invalidated the "limitation of liability" provision elsewhere in the contract. The district court, uncertain of the legal validity of this argument, certified to the Massachusetts Supreme Judicial Court the following question:

> Assuming that the Westinghouse exclusive remedy [in its warranty] failed [because Westinghouse failed to replace the sheared-off blades promptly] ... is the provision entitled Limitation of Liability enforceable under the circumstances alleged in this case?

The Supreme Judicial Court answered that the limitation clause was still enforceable. The district court consequently dismissed Canal's equipment warranty claims. And, for other reasons (which we shall discuss in Part IV below), it dismissed all the claims of Canal's customers, the third-party plaintiffs.

Following the ruling of the Supreme Judicial Court, Canal reformulated, and then proceeded with, its remaining, "service warranty" claim. It argued that the fretting that occurred between November 1983 and April 1985 (fretting that was discovered in 1985) violated the warranty against defects in workmanship. It sought as damages, not the "consequential" damages flowing from the July–November 1983 generator down-time, but, rather, those exceptional costs involved in the April 1985 outage, including those of diagnosing, and curing, the fretting problem.

As we have said, the district court submitted Canal's service warranty claim to the jury. The jury awarded Canal $380,000 plus interest. Westinghouse appeals this award; Canal cross appeals; and the third-party plaintiffs appeal as well.

## II

### The Westinghouse Appeal

The Westinghouse appeal turns upon the meaning of a key word in the warranty

itself, the word "appear." The warranty says that the defect must "appear" within one year. Westinghouse argues that the fretting in the blades installed in November 1983 did not "appear" within the next year and that no reasonable juror could find to the contrary. After reading the record, we conclude that Westinghouse is correct.

A

*Service Warranty Background*

*The Warranty Provision.* The warranty provision says:

> Westinghouse warrants that the work performed ... will be free of defects in workmanship ... beginning with the start of work and ending one year after the unit is ... ready for service. Should any failure to conform to this warranty *appear* within the warranty period, Westinghouse shall correct such nonconformity, by repairing· or, at its option, replacing the defective work. (Emphasis added).

This promise amounts to a one-year warranty. *See, e.g.,* Barkley Clark and Christopher Smith, *Law of Product Warranties* ¶ 11.04, at 11–31 (1984) ("[M]any products are expressly warranted 'against defects in material and workmanship for one year.' In such a warranty, the duration is one year...."). And, we can read these two sentences only together, as offering protection against defects that "appear" within the one-year time period.

*Facts related to the Service Warranty claim.* The key facts relevant to the Westinghouse appeal, in addition to those mentioned earlier, include the following: The generator's service warranty was for one year. That year began to run in November 1983. It ended in November 1984. During the seventeen months between November 1983 and April 1985, the generator was continuously "on-line." No one stopped the generator or opened it to inspect the blades. No one noticed anything unusual about the generator. In April 1985 Canal took the generator "off-line" for a routine inspection. Then, during that inspection, Westinghouse found fretting in the replacement blades (the "Row 11 blades") that had been installed in November.

At trial Canal's expert witness and Westinghouse's expert witness agreed about the nature of "fretting." When two metal surfaces come into contact (say, where the metal blades in Row 11 of Canal's turbine touched the metal core of the turbine), tiny submicroscopic irregularities at the contact points may squash. The metal begins to smear or form small particles of debris, which may oxidize. The metal then forms microscopic cracks, invisible to the human eye. The cracks become larger, eventually becoming visible, and·continue to grow to the point where the metal breaks. Vibration of some sort likely causes this process to begin and to continue. .

The two experts also agreed that, in April 1985, when the metal blades in Row 11 of Canal's turbine were removed from their settings, the fretting had progressed to the point that one could see with the naked eye both tiny cracks and dark oxide.

The two experts disagreed, however, about when the "fretting" began, and when the cracks and oxidizing would have become visible to a competent observer. Canal's expert said that, in his opinion, the fretting process began soon after the turbine went back on-line in November 1983. The cracks (or oxidizing) would have progressed beyond the microscopic, and become visible, soon thereafter. Westinghouse's expert, however, said that, once "vibratory stress" begins to cause·fretting, the fretting develops rather quickly, with the entire process (depending on how strong the vibration and how long it lasts) taking "hours or days, not weeks or months or years." This fact suggests that the fretting could have begun, or become visible, only a short time before· it was discovered in April 1985. The expert concluded that, "one cannot tell between November of '83 and April of '85 actually which portion of the total time period did the fretting really start."

Given the conflicting views of the experts, the jury might have adopted any one of three reasonable conclusions: 1) that the fretting began, and progressed to the point of visibility, during the year November 1983/November 1984; or 2) that the fretting began during that year but remained invisible to the naked eye until after that year ended; or 3) that the fretting did not even begin until after that year ended.

*The Jury Instruction.* The district court, in effect, defined the word "appear" to mean "exist." The court told the jury that, if "fretting *existed* within the year,

... then you may find ... a breach of warranty." Since "fretting" begins with tiny invisible smears of metal, followed by cracks too small for even a competent observer to see with the naked eye, this instruction permitted the jury to find a breach of warranty even if the jury (accepting much of what Westinghouse's expert said) believed that no visible crack appeared until *after* November 1984. The jury, as we have said, found a breach of warranty.

*The Dispositive Issue.* In order to decide whether the record entitles Westinghouse to a new trial or to a directed verdict, we must decide the meaning of the word "appear" in the warranty. Does that word, as the district court believed, simply mean "exist?" If so, the verdict in Canal's favor must stand. Does that word, as Westinghouse argues, mean something like "is perceived," or "is noticed?" If so, we must reverse the verdict, for the parties concede that no one actually noticed, found, or discovered the fretting during the warranty year. Or, lastly, does the word invoke some alternative legal interpretation, one that falls somewhere between these two extremes?

The facts relevant to this legal decision are not in dispute. Neither party suggests that extrinsic evidence will help interpret this contractual term. We cannot find the type of fact-related ambiguity as to which a jury's verdict might be relevant. We therefore interpret the words of the contract as a matter of law. *Restatement (Second) of Contracts* § 212(2) (1981) ("A question of interpretation ... is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence. Otherwise a question of interpretation of an integrated agreement is to be determined as a question of law."); *Robert Indus., Inc. v. Spence,* 362 Mass. 751, 291 N.E.2d 407, 409–10 (1973) ("The interpretation of an integrated agreement is a matter of law on which we are not bound by the trial judge's conclusions unless the problem of interpretation is affected by findings of fact."); *Ober v. National Casualty Co.,* 318 Mass. 27, 60 N.E.2d 90, 91 (1945); *Atwood v. Boston,* 310 Mass. 70, 37 N.E.2d 131, 134 (1941); *USM Corp. v. Arthur D. Little Sys., Inc.,* 28 Mass.App.Ct. 108, 546 N.E.2d 888, 893 (1989); *Thomas v. Christensen,* 12 Mass.App. 169, 422 N.E.2d 472, 476 (1981). *See also Hamed v. Fadili,* 408 Mass. 100, 556 N.E.2d 1020, 1024 (1990). *Cf. Corbin on Contracts* §§ 554, 554B (1960 & Supp. 1991).

### B
### *The Meaning of "Appear"*

■ We have examined the many volumes of record and the lengthy briefs, searching for evidence that the parties intended some special meaning when using the word "appear" in this warranty. We have found none. That being so, we have considered ordinary English, the context (repairing a complex machine), and warranty-related case law. We conclude that, for purposes of this warranty, a defect "appears" during the warranty period if *either* 1) it is in fact perceived during that period, *or* 2) it would have been perceived during the course of an inspection that a reasonable user would *normally* have made during that period.

We feel compelled to go beyond the first clause of this definition (*actual* perception), and add the second clause for two reasons. First, in ordinary English, "appear," while normally referring to the *fact* of perception ("be in sight"), may also refer to the *capacity* to be perceived ("be visible," where visible means "capable of being seen"). *Webster's Third New International Dictionary* 2557 (3d ed. 1976). It makes sense, at least sometimes, to talk about the full moon "appearing" above the cabin whose inhabitants do not perceive it, for they are fast asleep.

Second, in the context of warranty repairs, it would seem unfair, perhaps irrational, to hold unprotected the warranty holder who, for some special reason, fails to look at the large crack that, say, splits in two his boat's hull, or his car's engine. At least sometimes, it makes sense to say that such a crack "appeared in the boat's hull," or "appeared in the car's engine," even if the boat's or car's owner did not *in fact* look at the boat (say, the boat was in dry dock for the winter) or the car (say, the car was being stored in a garage).

At the same time, we cannot go to the opposite extreme and hold that a defect "appears" simply if it "exists." To define the word "appear" so broadly in the war-

ranty context would often make warranty time-limits ineffective. As the Second Circuit explained in an automobile warranty case

> virtually all product failures discovered in automobiles after expiration of the warranty can be attributed to a "latent defect" that existed at the time of sale or during the term of the warranty. All parts will wear out sooner or later and thus have a limited effective life.... A rule that would make failure of a part actionable based on such "knowledge" would render meaningless time/mileage limitations in warranty coverage.

*Abraham v. Volkswagen of America, Inc.,* 795 F.2d 238, 250 (2d Cir.1986). *See also Walsh v. Ford Motor Co.,* 588 F.Supp. 1513, 1536 (D.D.C.1984).

Nor can we say that a defect "appears" so long as *any* inspection, no matter how complex, no matter how unusual, during the warranty period would have turned up signs. One can often imagine some kind of special inspection that might have been, but was not, made during the warranty period, say (to use an exaggerated example for illustrative purposes) the inspection of a boat's hull by a brigade of wood-specialist Ph.D.'s armed with electron microscopes, that might have uncovered a special weakness that did not, in fact, become a problem until many years later. To insist upon liability for unobserved defects that only such heroic (and hypothetical) inspections may have found would extend a warranty's life well beyond its specified time period, eroding its intended liability-limiting language.

It therefore is not surprising that case law almost uniformly holds that time-limited warranties do not protect buyers against hidden defects—defects that may exist before, but typically are not discovered until after, the expiration of the warranty period. *Cf. Black's Law Dictionary* 883 (6th ed. 1990) (latent defect is one "not apparent on [the] face of [the] goods" and which "could not be discovered by reasonable and customary observation or inspection"). Some of the cases turn specifically on the fact that the warranty-period had expired by the time the defect was discovered, irrespective of whether or not the warranties impose a "defect must appear" or "defect must be discovered" precondition. *See, e.g., Abraham,* 795 F.2d at 250 (rejecting claim that 12 month warranty covers "latent," undiscovered, defects); *To-*

*kar v. Crestwood Imports, Inc.,* 177 Ill. App.3d 422, 126 Ill..Dec. 697, 699, 703–04, 532 N.E.2d 382, 384, 388–89 (1988) (same); *Kodiak Elec. Ass'n v. Delaval Turbine, Inc.,* 694 P.2d 150, 157 (Alaska 1984) (one-year repair and equipment warranty for electric generator was not breached when "defect did not make its presence known until the time of the [later] generator failure"). *See also* Special Project, *Article Two Warranties in Commercial Transactions: An Update,* 72 Cornell L.Rev. 1159, 1261 (1987) ("[time] limitations effectively exclude warranties covering non-conformities that a buyer could not reasonably discover within the prescribed time period"). Other cases involve a warranty that itself specifies that the defect must be "found" or "discovered" or the like; hence they, more easily, reach the same conclusion. *Boston Helicopter Charter, Inc. v. Agusta Aviation Corp.,* 767 F.Supp. 363, 374 & n. 11 (D.Mass.1991); *Hart Eng'g Co. v. FMC Corp,* 593 F.Supp. 1471, 1474 (D.R.I.1984); *Walsh,* 588 F.Supp. at 1536; *Taterka v. Ford Motor Co.,* 86 Wis.2d 140, 271 N.W.2d 653, 657 (1978); *Broe v. Oneonta Sales Co.,* 100 Misc.2d 1099, 420 N.Y.S.2d 436, 437 (Sup.Ct.1978); *Moulton v. Ford Motor Co.,* 13 U.C.C.Rep.Serv. 55, 59 (Tenn. Ct.App.1973), *aff'd in relevant part,* 511 S.W.2d 690, 694 (Tenn.), *cert. denied,* 419 U.S. 870, 95 S.Ct. 129, 42 L.Ed.2d 109 (1974). *But cf. Alberti v. General Motors Corp.,* 600 F.Supp. 1026, 1027–28 (D.D.C. 1985) (permitting recovery for latent defect under special circumstances); *Lidstrand v. Silvercrest Indus.,* 28 Wash.App. 359, 623 P.2d 710, 714 (1981) (same).

To define "appear" as less than "exist" is consistent with the dictionary definitions of the term. For example, *Webster's Third New International Dictionary* defines "appear," in significant part, as "come into view," "reveal to an observer," and "become discovered." Only in one element of its sixth listing does the dictionary define "appear" as "come into existence." *Webster's Third New International Dictionary* 103 (3d ed. 1976). *See also The Oxford English Dictionary* 566 (2d ed. 1989).

For these reasons, we have concluded that we can stretch the scope of the word "appear" only slightly, covering a relatively narrow category of defects that are not actually observed. We have noted that *Black's Law Dictionary* defines "apparent defect" as a "defect[ ] in goods which can be discovered by *simple* inspection,"

*Black's Law Dictionary* 96 (6th ed. 1990), and it defines a "patent defect" as one that is "plainly visible or which can be discovered by such an inspection as *would* be made in the exercise of ordinary care and prudence." *Black's Law Dictionary* 1126 (6th ed. 1990) (emphasis added). In light of these definitions, and the factors discussed previously, we have concluded that the term "appear" can encompass defects that were not, in fact, perceived, but only if they would have been perceived during a reasonable inspection that would normally have been made during the period the warranty is in effect.

We intentionally specify that the inspection must be one that *normally* is made during the time period. A car owner who takes apart the engine each year to search for tiny cracks, or a boat owner who examines the hull each year with magnifying equipment, has not necessarily made an "unreasonable" or "imprudent" inspection, but he has made the kind of inspection that one does not *"normally"* make on an annual basis. To permit the hypothetical, theoretical, possibility of *abnormal,* or *unusual,* annual inspections to trigger warranty liability would undercut the considerations, supported by policy and case law, that we have discussed above. To limit the "reasonable" inspection to those that are "normal" is consistent with those considerations. And, the result seems consistent with common sense. In respect to a one-year warranty, a large crack in an engine block, plainly visible as soon as one lifts the car's hood, would "appear," within the year, even if the car's owner did not, in fact, lift the hood and see the crack. One normally (and reasonably) will lift the car's hood many times each year. But, tiny unseen cracks, inside a car's engine block, would not "appear." One does not normally look inside a car's engine block every year. What is normal, and what is not normal, of course, may differ where a ten-year, rather than a one-year, warranty is at issue.

## C

### *Applying the Interpretation*

■ Applying our legal interpretation of the word "appear" in the contract to the facts of this case, we must reverse the verdict and order a directed verdict for Westinghouse.

The parties agree that no one, in fact, perceived any fretting during the warranty year November 1983/November 1984. No one stopped the generator to look for fretting, nor did the generator make any special noise, specially vibrate, or give any other outward sign. The experts disagreed over whether the Row 11 blade fretting was visible prior to November 1984, when the warranty period expired. Viewing the evidence favorably to Canal, the jury at most might have believed that an "off-line" blade inspection by a competent observer during the warranty period would have uncovered small, but visible cracks.

On this factual assumption, the unseen cracks would have been seen had a reasonably competent observer inspected the Row 11 blades during the year in question. But is an inspection of this sort the kind of inspection that would *normally* have been made during the year? Having examined the record, we cannot find sufficient evidence to permit a jury to give an affirmative answer. The trial record makes few references to the timing of Canal's inspections. In one of those references, one of Canal's witnesses, James P. Bailey, indicated that the company does not ordinarily examine the blades every year. Indeed, Bailey suggested that the company had to conduct a special·inspection of the blades in 1986, just one year after a similar inspection in April 1985. The 1986 inspection, said Bailey, "was to look at Row 11.... Because we wouldn't have had any other reason to, we don't *normally* open that machine once a year, we have no other reason to open it but to look at Row 11." App. 1245 (emphasis added). This point is underscored by Canal in its own appellate briefs, where the company declared that, "There was also testimony that it would *not* have been reasonable to inspect Row 11 before it was inspected in April 1985." (emphasis added). Other testimony suggests that Canal may have opened up the entire football-field length turbine each year; *see* App. 1013; but, it does not suggest that Canal would normally take apart and examine each part of the turbine every year; nor that Canal would annually inspect the base of the turbine blades where the fretting occurred. Photos in the record, together with the totality of testimony on the matter, would not permit the jury to

conclude that inspecting the blades at their roots was normally an annual affair.

Canal does not argue the contrary. Indeed, Canal itself confirmed, in earlier proceedings before the district court, that it ordinarily did not examine the turbine blades on a yearly basis. For example, in its memorandum opposing Westinghouse's motion for directed verdict, Canal said that given the enormous number of parts in turbines and the difficulty and expense in dismantling them, *it is impractical to require that buyers inspect every new part purchased from Westinghouse on an annual basis to preserve their warranty rights. Such an inspection is simply not feasible.*

In oral arguments before the district court, Canal underscored this view:

Because the turbine is such a large item—and in fact it's quite large ... there's a whole building for it—every portion of the turbine is not inspected during every annual outage. Some portions get inspected this year, some portions next year. In fact, *the portion in which the blades in question ... are housed was not getting looked at every year during the time period that brought us to the event in question.*

And, later in this hearing, counsel explained,

This is not like a spark plug in your car which you change every year or two. the expectation is that these have quite a long life.... This is not a part that you had to look at annually and check for changeover annually. *In fact, until we began having problems with [the blades], it was not looked at but every two or three years because of the expectation of long life and reliability.*

We must conclude: 1) The defect was not found or discovered during the warranty period. 2) Canal's failure to stop the turbine and inspect the roots of the Row 11 blades during 1984 was not abnormal or extraordinary. Hence, the record would not permit a finding that the defect "appeared," even in an expanded sense of that word.

### D
#### Canal's Final Arguments

In oral argument before this court, Canal implied that, had the district court ruled that the term "appear" involved the concept of reasonable and normal inspections, Canal would have presented evidence that an inspection of the Row 11 blades during the year would have been an appropriate, reasonable, and, under the circumstances, normal thing to do. Canal's counsel told us that:

the turbine is maintained on an annual basis. We do one [unit] in the fall and one in the spring. This turbine [unit] gets done every Spring. In the Spring of 1984 there was a meeting in which a discussion took place—this did not show up at trial ... but there was a discussion with Westinghouse in the Spring of 1984, 'should we go in and look at these blades?' Which would clearly have been within the year. And Westinghouse said, 'we don't see any reason to do so if you don't see any reason to do so.' As a result of [the district judge's] ruling that he was going to treat appearance as coming into existence, we didn't then have to put in evidence that it was reasonable or unreasonable to look within the year.

Canal's contention—that it conducted yearly maintenance inspections of the turbine unit—is consistent with the record evidence and Canal's previous statements. While Canal may have inspected the unit on an annual basis, Canal did not claim that it examined every component of the turbine during each outage, or that it annually took apart the blades in each row to examine their base. Indeed, as Canal states in its appellate brief, such a comprehensive inspection process would normally have been "unreasonable."

Canal's argument seems to be that, given the recurring problems in the blades, Westinghouse should have recommended an inspection of the turbine blades in 1984. In that case, it would have noticed the fretting before the expiration of the warranty period. The problem with this argument is simply that it comes too late. Canal did not pursue at trial a claim that Westinghouse violated its warranty by failing to recommend a special inspection. Nor did it produce evidence designed to show that annual examination of the base of the Row 11 blades would have been normal under the circumstances. A party must choose the theories on which it will try its case. Canal asked the court for the instruction defining "appear" as "exist." It made clear it would try the case on this theory. It knew that Westinghouse opposed its po-

sition and that Westinghouse considered that Canal's proposed instruction improperly included "latent" defects. Both parties mentioned the matter of possible inspections in that context. Canal had notice of the problem. It might have proffered *evidence* about the timing of inspections. But, it did not do so. And, it cannot now ask for a retrial to put in evidence it did not proffer, but might have offered had it known that the instruction that it sought was incorrect. A party cannot, in this sense, "have it both ways;" otherwise, as a purely practical matter, it would be difficult for courts effectively to resolve disputes within a reasonable time. Moreover, having reviewed the entire record in this hard fought, long, and expensive litigation, we believe that it is fair, both to Canal and to Westinghouse, to review the evidentiary record as it was, not as it might have been, created.

### III

#### *Canal's Cross–Appeal*

Canal appeals several different district court determinations. Some of these concern the "breach of warranty" claim just discussed; others concern additional claims that Canal raised in its own law suit.

### A

#### *Unconscionability*

Canal's cross-appeal challenges, in part, the district court's dismissal of its earlier, different, claim, the claim that Westinghouse breached its equipment warranty entered into in 1983. As we have previously pointed out, Westinghouse found blade fretting in late February 1983, and in July 1983 the blades "sheared off." Westinghouse replaced the blades each time, completing its work in November 1983. Canal, in its complaint, said that the blades Westinghouse installed in March violated its *equipment* warranty. Canal asked largely for "consequential" damages caused by the four-month delay in installing new blades, between July and November, after the March-installed blades failed. The district court dismissed this claim on the ground that the equipment warranty expressly limited Westinghouse's damage liability, obliging Westinghouse simply to refund the purchase price of the defective blades—which the parties concede Westinghouse did (*see* Appendix). Canal appeals this dismissal on the ground that the limitation of liability in the contract is invalid because it is "unconscionable." Mass.Gen.L. ch. 106, § 2–302 (general unconscionability provision); § 2–719(3) ("[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable"); § 2–719(3), Code Comment (U.C.C. provision authorizing limitations on remedy "is consistent with the provisions of the code ... with respect to unconscionable contracts or clauses"). Canal argues that the Massachusetts Supreme Judicial Court did not fully decide the matter, since the certified question came with a stipulated assumption of "no unconscionability."

In evaluating Canal's argument, we have examined Canal's specific contract-related reasons for claiming that the liability limitation is "unconscionable." We have divided them into three categories: a) inadequate contractual remedies, b) unfair allocation of harms, and c) unfair Westinghouse negotiating behavior. We shall consider each category separately.

First, Canal points out that the liability limitation means that Westinghouse need do no more than issue a credit for the defective blades, leaving Canal to bear alone the potentially severe harm that defective equipment might produce. Canal says that the limitation is therefore invalid, for it leaves one of the contracting parties (namely, Canal) without "minimum adequate remedies." Mass.Gen.L. ch. 106, § 2–719, U.C.C.Code Comment 1 ("[I]t is the very essence of a sales contract that at least minimum adequate remedies be available."). The fatal flaw in this argument derives from the fact that the district court's certified question required the Supreme Judicial Court to express a view about this very matter. And the Supreme Judicial Court rejected this aspect of Canal's argument, upholding the limitation clause at least with respect to its exclusion of consequential damages. *Canal Elec. Co. v. Westinghouse Elec. Corp.*, 406 Mass. 369, 548 N.E.2d 182, 185–86 (1990). The Court's ruling is not surprising, for the liability limitation clause simply reflects a decision by highly sophisticated business entities about how to allocate certain risks common in the electricity industry. *Deerskin Trading Post, Inc. v. Spencer Press*

*Inc.*, 398 Mass. 118, 495 N.E.2d 303, 307 (Mass.1986) ("Limiting damages to a refund of the purchase price in the circumstances of this case, where the two parties are sophisticated business entities, and where consequential damages in the event of a problem could be extensive, is a reasonable business practice...."); Mass. Gen.L. ch. 106, § 2–719, U.C.C.Code Comment 3 (clauses limiting or excluding consequential damages "are merely an allocation of unknown or undeterminable risks"). The Supreme Judicial Court recognized the particular allocation of risk embodied in the present warranty contract as standard in the electric power generating industry. *Canal Elec. Co.*, 548 N.E.2d at 185. And, it found such an allocation especially reasonable given the highly complex, technical nature of the product. *Id.* at 186. *See also Logan Equip. Corp. v. Simon Aerials, Inc.*, 736 F.Supp. 1188, 1196 (D.Mass. 1990) (exclusion of consequential damages is a "valid and reasonable allocation of commercial risk, especially in light of the somewhat 'experimental' nature" of the product).

As we have said, Canal now points out that, when the Court answered the district court's certified questions, it had before it a stipulation in which Canal specifically said that the liability limitation was *not* unconscionable. Canal adds that the Supreme Judicial Court therefore did not consider the "minimum adequate remedies" question in the context of a "contract-is-unconscionable" argument. We do not see, however, how it can help Canal to dress up the same old—and decided—"adequate remedies" argument in new "unconscionability" clothing. Insofar as Canal's "unconscionability" claim rests upon the contention that the liability limitation clause leaves the contract without minimally adequate remedies, we believe—given the Supreme Judicial Court's response—that we must reject it. (We note, however, that our holding, like that of the Supreme Judicial Court, is limited to unconscionability in respect to consequential damages. Canal does not specifically ask for non-consequential damages under the *equipment warranty* for losses incurred during the Spring 1983 outage, nor has the plaintiff claimed that a restriction on *non*-consequential damages makes the clause unconscionable *per se* ).

■ Second, Canal points to the burdens that the liability limitation has imposed upon it. Four months or more delay during the Summer and Fall of 1983, while Westinghouse replaced the defective blades that had failed in July 1983, meant keeping an important generator off-line at a crucial time, which, in turn, meant significant damages in terms of lost profits. This fact, however, cannot show "unconscionability," for it is simply the realization of the risks that the parties allocated in the contract. If the contract's remedial scheme is minimally adequate, as we have found, then the occurrence of an event that triggers that scheme, limitations and all, cannot change the legal result. As one court said, in respect to a scheme less justifiable than this one, "[t]he code's unconscionability provisions were, after all, not intended 'to relieve an experienced merchant of the misfortunes occasioned by his own poor business practices.'" *Hart Eng'g Co.*, 593 F.Supp. at 1480 (quoting *Argo Welded Prod., Inc. v. J.T. Ryerson Steel & Sons*, 528 F.Supp. 583, 593 (E.D.Pa.1981)).

■ Third, Canal alleges a host of specific factual events that, it says, show that Westinghouse behaved most unfairly at the time it entered into the equipment contract in early 1983. For example, Canal charges that Westinghouse knew about prior blade fretting (in 1981 and in February 1983) and was concerned about the reliability of the turbine blades, yet said nothing about it. Worse, Westinghouse gave Canal the impression that no serious problem existed, knowing the contrary, and unfairly taking steps to limit its liability in the contract. These, and other similar acts and failures to disclose, by themselves, says Canal, show "unconscionable" behavior on the part of Westinghouse, invalidating the contract. The Supreme Judicial Court did not decide to the contrary, says Canal, for this kind of claim was nowhere raised in the district court's certified question.

Canal is correct about not having raised the point before the Supreme Judicial Court, but that is just the problem. As far as we can tell, Canal has never raised this point before. In fact, Canal declared in one of its pleadings that it would not raise an "unconscionability" claim at all; at another time, Canal indicated that any "unconscionability" claim would rest simply upon the failure of the contract to provide minimally adequate remedies. We have examined the record; we can nowhere find this new, third argument stated with even moderate

clarity. Moreover, we have no reason to believe that it is a particularly strong fact-based argument. After all, Canal, too, knew about the earlier pre-contract fretting problems. But, irrespective of the factual weakness of this third kind of "unconscionability" claim, we find that Canal has waived its right to raise this issue so late in the proceedings.

For these reasons, we find Canal's "unconscionability" argument unpersuasive.

## B

### Other Arguments

Canal raises a host of other claims in its cross-appeal. Our decision in the Westinghouse appeal, however, disposes of, or moots, them all. We shall briefly indicate, for counsel, why that is so:

1. *"Canal is entitled to prejudgment interest from the date the suit was filed."* Since Canal is not entitled to a judgment, it is not entitled to interest.

2. *"The district court erred when it excluded certain portions of Canal's expert testimony."* We have examined the excluded portions. None of them makes a difference to our result in Part II. Consequently, the argument is moot.

3. *"The district court erred in permitting the jury to consider Westinghouse's waiver and accord and satisfaction defenses."* Those defenses concerned Westinghouse's efforts to eliminate certain items from the calculation of damages. Since Canal is not entitled to damages, the issue is moot.

4. *"The district court erred in not permitting Canal to assert claims under Mass. Gen.L. ch. 93A."* The Massachusetts Supreme Judicial Court, in response to a certified question, held that Canal could not assert such a claim. We find Canal's efforts to escape the effect of that response unpersuasive. Regardless, Canal's Chapter 93A claim is essentially the same as its "breach of warranty" claim. It would therefore fail for similar reasons.

## IV

### The Third–Party Appeals

■ A group of Canal's customers, buyers of electricity, also sued Westinghouse. They alleged a violation of Mass.Gen.L. ch. 93A. They point out that the statute is one "of broad impact which creates new substantive rights," *Slaney v. Westwood Auto, Inc.,* 366 Mass. 688, 322 N.E.2d 768, 772 (1975), and they argue that it permits them to recover damages, representing extra costs and lost profits, arising out of Westinghouse's failure to repair the turbine properly in 1983 and 1985. Irrespective of the liability limiting provisions in the Westinghouse–Canal contract, the district court held that Chapter 93A does not permit the customers of one of the contracting parties to recover damages for that kind of economic harm in this kind of lawsuit.

■ We agree with the district court. The harm to Canal's customers flowed from an action that, if wrongful, must have constituted either some kind of tort (perhaps negligence) or some kind of breach of contract (say, breach of the warranty). Tort law, however, does not normally permit a plaintiff to recover purely economic losses caused by the negligence of another person. One can best understand the policy reasons that underlie this traditional limitation on tort recovery by focusing upon an auto accident, caused by a driver's ordinary negligence, in the middle of the Callahan Tunnel. Were the law to permit persons who simply suffer consequent economic harm to recover, even for foreseeable harm, liability would be enormous, for traffic delay is easily foreseeable, that delay is harmful, and that harm is costly. As a result, the law restricts liability for this type of negligently-caused economic harm, though, at the same time, it permits recovery for such harm in special circumstances; for example, where the defendant engages in an intentional tort, *Beekman v. Marsters,* 195 Mass. 205, 80 N.E. 817 (1907), where physical harm accompanies economic loss, *Newlin v. New England Tel. & Tel. Co.,* 316 Mass. 234, 54 N.E.2d 929 (1944), or where the defendant publishes false and disparaging statements. *System Operations, Inc. v. Scientific Games Dev. Corp.,* 555 F.2d 1131 (3d Cir.1977). We have explained all this previously, and in detail. *See Barber Lines A/S v. M/V Donau Maru,* 764 F.2d 50 (1st Cir.1985). We need only refer the reader to that opinion, while adding that the plaintiffs have given us no reason to think that this case falls within the exceptions rather than the rule, or that Chapter 93A would reach beyond the traditional rule in a tort-based action.

We reach the same conclusion in respect to an action based upon contract. We do not deal here with a contract between Westinghouse and the third-party plaintiffs. Nor do we deal with a contract that intentionally places those plaintiffs in some kind of special relationship, such as that of a third-party beneficiary. *See, e.g., Public Serv. Co. v. Hudson Light & Power Dep't,* 938 F.2d 338 (1st Cir.1991); *Rae v. Air–Speed, Inc.,* 386 Mass. 187, 435 N.E.2d 628, 632–33 (1982). At the same time, the policy reasons that militate against recovery would seem at least as strong as in the case of tort law. If a delayed trucker cannot recover from the negligent driver whose accident blocks the tunnel, that same trucker should not be able to recover from the manufacturer of the car's engine when a breach of the engine's warranty caused the accident. *Barber Lines A/S,* 764 F.2d 50. We can find no Massachusetts case that comes close to awarding damages for purely economic harm in such circumstances; namely, where the failure of a part or service, breaching a warranty between the *owner* of the defective machine and the *manufacturer* or *servicer,* inflicts economic damages on the owner's *customers.*

Given the absence of precedent and the policy reasons that militate against permitting recovery, we believe the judgment of the district court must be affirmed.

The judgment for Canal is

*Reversed.*

The dismissal of the third-party suit is

*Affirmed.*

### APPENDIX

**Warranty**

**Field Repair and Maintenance, and Installation**

Westinghouse warrants that the work performed hereunder, including its engineers' work and any materials supplied under the contract, will be of the kind and quality described in the proposal and will be free of defects in workmanship and material beginning with the start of work and ending one year after the unit is considered by Westinghouse ready for service. Should any failure to conform to this warranty appear within the warranty period, Westinghouse shall correct such nonconformity, by repairing or, at its option, replacing the defective work.

**Limitation of Liability**

Westinghouse, its contractors and suppliers of any tier shall not be liable in contract, in tort (including negligence), strict liability or otherwise for any special, indirect, incidental or consequential damages whatsoever including, but not limited to, loss of profits or revenue, loss of use of equipment or power system, cost of capital, cost of purchased or replacement power or temporary equipment, claims of customers of the Purchaser or damage or loss of property or equipment, not included within Westinghouse's scope of supply or services under these terms and conditions. The remedies of the Purchaser set forth herein are exclusive, and the total liability of Westinghouse and its contractors and suppliers of any tier with respect to these terms and conditions, or anything done in connection therewith such as the performance or breach thereof, or from the manufacture, sale, delivery, resale, installation or technical field assistance for installation, maintenance or technical field assistance for maintenance, repair or use of any equipment covered by or furnished under the contract whether in contract, in tort (including negligence), strict liability or otherwise shall not exceed the price set forth for the work in the purchase order or individual authorization out of which the liability arises.

### MEMORANDUM AND ORDER

Oct. 16, 1992.

The plaintiff, Canal Electric Company, seeks a rehearing of our decision in Docket Nos. 91–1433 and 91–1504. The third-party plaintiffs, Commonwealth Electric Company, et al., petition for a rehearing in Docket No. 91–1432. The third-party plaintiffs, essentially, repeat the arguments they made originally on appeal. They point to Massachusetts authority, under Massachusetts General Law Chapter 93A, that permits a party to a contract to recover damages for economic harm that the party suffered as a result of another contracting party's unfair or deceptive behavior. *McEvoy Travel Bureau, Inc. v. Norton Co.,* 408 Mass. 704, 563 N.E.2d 188 (1990). They point to other Massachusetts authority that permits a plaintiff to recover for harm caused by such behavior even though the plaintiff is not "in privity" with the party causing the harm. *Van Dyke v. St. Paul Fire & Marine Ins. Co.,* 388 Mass. 671, 448 N.E.2d 357 (1983). They then seek to combine the

lines of authority, arguing that Massachusetts law permits them to recover for the kind of economic harm they suffered even though they were not parties to the contract with Westinghouse.

In our opinion we explained why we believed that the third-party plaintiffs could not convincingly combine Massachusetts authorities in a way that would permit recovery. We do not believe that Massachusetts, as a matter of course, permits a person who is not party to a warranty to recover for *certain kinds* of purely economic harm caused by its breach—the kind of harm, for example, that a trucker might suffer when traffic is backed up because of a stalled car, whose motor has broken, say, in breach of a parts warranty. We have found nothing in the rehearing petition that would lead us to revise this conclusion.

The plaintiff makes two arguments. First, plaintiff argues again that the contract was ambiguous enough to warrant a jury finding in its favor on the theory that the word "appear" means "exist." If .the contract were not written against a legal ("warranty law") background, we might agree with the plaintiff about the extent to which one can reasonably stretch ambiguous language. But, given the "warranty law" background set forth in the opinion, we maintain our belief that we cannot reasonably stretch the meaning of the word "appear" in plaintiff's favor any more than we have done.

Second, plaintiff argues that we should have ordered a new trial so that it can put in evidence showing, for example, that Westinghouse is responsible (presumably by uttering reassuring language) for Canal's not having made a thorough inspection of the new blades during the warranty year. We found this point the most difficult in the case, and (although plaintiff will likely draw only the coldest comfort from this fact) we debated it among ourselves at length in much the terms that plaintiff sets forth in the rehearing petition. We agree that a certain kind of "equity"—namely, that plaintiff might have tried its case differently had it known our ultimate interpretation—weighs in favor of a new trial. *But*, ultimately, we found determinative several considerations that weigh the other way. For one thing, the plaintiff not only left the record devoid of evidence suggesting that annual blade inspection was normal, but it also argued the contrary both in the district court and the court of appeals. We see some legal virtue to holding the parties to positions they have taken (after careful consideration and throughout lenghthy litigation) even if later a "surprise" suggests that a different position, or having tried to show contrary facts, would have proved more fruitful. For another thing, the "surprise" at issue here is (or should have been) somewhat less surprising than counsel suggests. The "new" interpretation we provided is not really new to warranty law; rather, it amounts to a slight clarification of the standard used to distinguish latent from patent defects, a standard discussed by both parties in their initial briefs. Further, the relation between the "new" evidence that plaintiff now wants to present and the "new" interpretation is not very clear. The "new" evidence does not seem aimed at showing that an annual inspection was "normal," so much as it seems designed to show a separate breach of warranty. Finally, since plaintiff had obtained the instruction that it wanted from the district court, it seems unfair to defendant now to give plaintiff a second chance, apparently to argue a theory (i.e., that Westinghouse prevented it from discovering, or finding the defect) that it might have argued initially and which it probably would have argued had Westinghouse won the "instruction battle" in the district court.

Having said this, we still find the issue a close one, but we reaffirm our decision not to order a new trial.

The petitions for rehearing are *Denied.*